**McGRAW–HILL, INC., et al., Plaintiffs,**
**v.**
**WORTH PUBLISHERS, INC., et al.,**
**Defendants.**

No. 71–Civ. 3975.

United States District Court,
S. D. New York.

Dec. 15, 1971.

Schwab & Goldberg, New York City, for plaintiffs by Morton David Goldberg and Richard Dannay, New York City, of counsel.

Greenbaum, Wolff & Ernst, New York City, for Worth Publishers, Inc. by Harriet F. Pilpel, Roger Bryant Hunting, Robert D. Croog, Barron M. Tenney, and Milbank Tweed, Hadley & McCloy, New York City, of counsel.

CROAKE, District Judge.

### MEMORANDUM

This is a motion for a preliminary injunction in an action seeking an injunction and damages for alleged infringement of statutory copyright. Plaintiffs are the publishers and authors of an economics textbook ("McConnell text") and related works.[1] Defendants are the publisher, its president, and the authors of another textbook ("Spencer text") and related materials.[2] Both plaintiffs' and defendants' texts are designed to appeal to professors and students involved in introductory college-level economics courses.

The action was commenced on Friday, September 3, 1971, the day before the Labor Day weekend, at which time plaintiffs sought an order to show cause why the present motion should not be granted, as well as a temporary restraining order prohibiting the printing, selling, dis-

---

1. Plaintiffs' works are as follows: "ECONOMICS: Principles, Problems and Policies," Fourth Edition, "INSTRUCTOR'S MANUAL to Accompany McConnell Economics," Fourth Edition, and "TEST FILE for Use with Fourth Edition of McConnell Economics," all by McConnell, and "STUDY GUIDE to Accompany McConnell Economics," Fourth Edition, by Bingham.

2. Defendants' works are as follows: "CONTEMPORARY ECONOMICS," by Spencer, "TEACHER'S MANUAL to Accompany Spencer: CONTEMPORARY Economics," by Spencer and Roslyn Spencer, "STUDY GUIDE to Accompany Spencer: Economics," by Converse and Murray, and "TEST BANK for use with Spencer: Contemporary Economics," and "MODEL EXAMINATIONS" for use with Spencer: Contemporary Economics, authors not listed.

tributing, advertising, and marketing of defendants' books, pending the determination of the motion at issue. That motion was denied by Judge Inzer B. Wyatt with leave to renew on September 7, 1971, the original return day of this motion. On that date the renewed motion for temporary relief was referred to Judge Edward Weinfeld by the judge then sitting, who had disqualified himself on the ground of a holding of convertible debentures in the plaintiff corporation. Judge Weinfeld heard arguments, considered the parties' affidavits and exhibits and plaintiffs' memorandum, and denied the motion by a memorandum opinion dated September 8, 1971. During the course of argument the present motion for preliminary relief was made returnable on September 13; by stipulation upon defendants' request, it was further adjourned to September 20, when it was heard by the undersigned.

The parameters of this decision have been amply developed by extensive prior case law in this circuit and elsewhere, since the present factual situation is not uncommon. The precedents, however, place prime significance upon the facts of each case, and characterize analogizing as relatively unprofitable. Peter Pan Fabrics v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960).

Substantial factual development is therefore warranted. The parties, whose briefs indicate their familiarity with the relevant law, have assisted the Court in this regard by submitting, on the present motion, seventeen factual affidavits totalling 145 pages, plus documentary exhibits the volume of which is measurable only in terms of cubic feet. The following factual description is based upon the Court's analysis of all these materials.

## I

Probably the most significant occurrence in the modern history of economics pedagogy was the publication in the late 1940's of Professor Paul Samuelson's *Economics* textbook. This book, continuously published by plaintiff McGraw-Hill, effected a fundamental reorganiza-tion of the methodology of teaching introductory economics courses in colleges, and has set the standard for all competing texts. Approximately 240,000 copies were sold in the first year of the most recent edition, sales being somewhat less in subsequent edition-years because of competition from used-book vendors.

This is not to say that Professor Samuelson lacks substantial competition. Indeed, there are about 65 competing books currently in print, foremost among which is the McConnell text, first published in 1960, with successive editions in 1963, 1966, and the present in 1969. Another edition, the fifth, has now been delivered to the publisher, and is in preparation for publication in the spring of 1972. Sales of this text have steadily risen both absolutely and in proportion to the Samuelson text, to the present point at which both texts are equally popular, and between them supply 65 percent of the annual market.

Nevertheless, there are continual attempts by other authors and publishers to obtain a portion of the lucrative 750,000-book annual market, and approximately five new or revised books are published each year. One of the seven new competitors in 1971 was the allegedly infringing Spencer text.

Defendant Spencer, a professor with twenty years' classroom experience and the author of 50 publications, including books, monographs and articles, first began work on the allegedly infringing text in 1968. Since that time his class hours have been reduced to practically nothing, thereby allowing three years of almost uninterrupted writing. Altogether, he claims to have spent about 6000 hours in the preparation of the manuscript. (Plaintiff McConnell estimates his first edition took 5000 hours to write.)

After Professor Spencer completed his labors, defendant Worth Publishers, Inc. expended $9,120 to obtain 90 reviews of the book by 60 different reviewers. In addition, a Mr. Roger Beardwood was retained to read and comment upon the work, to contribute a series of essays for

inclusion therein, and eventually to edit the complete opus.

Preparation of the Spencer text was eventually completed, with the first printing of 6774 copies on April 12, 1971, the date of publication. A second printing of 28,683 copies occurred on June 4, 1971, and a third of 57,256 copies on August 12, 1971. Sales promotion was immediately begun, as was distribution of complimentary copies: 5,151 copies were sent to professors in April of 1971, with 1,607 more sent through August.

The publication of the Spencer text, as of most such texts, was so timed as to make the book available for the beginning of the fall college semester. Fall classes generally begin in September, but publishers' wholesale sales to bookstores peak about two months earlier; publishers' September sales are usually "rush" orders designed to compensate for previously underestimated course enrollments. Consequently, sales of the Spencer text were as follows: 273 volumes were sold in April; 480 in May; 10,159 in June; 35,324 in July; 19,496 in August; and approximately 5,000 in the first week of September, for a total of roughly 70,000 volumes sold at the initiation of this lawsuit.

Plaintiffs have been aware for the last several years that defendant Spencer was writing his book (See generally affidavits of Thomas Kothman and Christopher Benz); they were no doubt aware of the efforts of other potential competitors as well. More detailed information regarding defendants' activities was received beginning in the winter of 1970–1971. (See affidavit of Campbell McConnell. ¶¶ 8–10, pp. 4–5.) Plaintiffs notified defendants of their claimed copyright infringement late in May of 1971; defense counsel disputed the validity of this charge on June 8, 1971. Some inconclusive conferences between the attorneys took place in June, and defendants received word from their salesmen that plaintiffs' salesmen were claiming that defendants were being sued; nevertheless, no direct action was taken by plaintiffs from June 29 to September 3, when this suit was instituted, as noted above.

The complaint states a general cause of action for infringement of the McConnell text as a whole by the Spencer text as a whole. On this motion, however, plaintiffs have assembled schedules specifying the offensive portions of the Spencer text; they total 7,375 words, or 1.74 percent of Spencer's total 424,000 words, excluding art. It might be noted that 40 percent of the Spencer text actually deals with novel material, or at least material on subjects not appearing in the McConnell text.

One other fact should be noted at this time. The normal life of a college textbook is three years, and is determined by competition not so much from other textbooks as from the used book market for the same text. Thus, for a new edition of an established text, sales generally peak in the first year, subside in the second year, and plummet in the third, as more and more students elect to save money by purchasing used rather than new books. There are, naturally, exceptions; changes in preference by instructors at a given college, based on their own personal tastes or mandated by departmental decisions, or because of advances in the discipline rendering the older editions outmoded, can result in the partial or complete substitution of one text for another before the three-year cycle has run its course.

The McConnell text is currently in its third year of the fourth edition; the fifth will appear in time for next fall, as noted above. Thus, in so far as the Spencer text has supplanted the McConnell text this year, the used book dealers more than the plaintiffs have suffered monetarily.

In this regard defendant Worth estimates that, of the 70,000 volumes of the Spencer text sold for use in 300 colleges and universities during the 1971–1972 school year, 20,000 of the volumes are replacing McConnell texts previously utilized. However, 10,000 volumes would probably have been replaced by other

new books in any event; and of the remainder, seven to eight thousand would have been acquired secondhand by the students. Worth estimates, therefore, that the maximum diversion for the current school year is approximately 2,500 volumes.

Plaintiffs do not dispute these figures, at least at the present time. While they obviously dislike any diversion, they appear particularly concerned, not about this year, but about the next. For sales of a new book, such as the Spencer text, do not follow the same cycle as sales of a new edition of an established text. In the first year many professors and schools are cautious, and wait to see the reaction of the educational community to the new work before they commit themselves to it. Second year sales of such a book, if it is favorably received the first year, may consequently even exceed the first year's total.

Plaintiffs' fear, then, is that the climate for acceptance of a new book is significantly better in this year than it would be in the next, when their new edition will be available. If the Spencer text should have first appeared in 1972, the chances of general acceptance, plaintiffs argue, would have been much diminished by the enhanced competition from the new McConnell edition. Therefore, the defendants' ability to achieve 1971 publication of the book—which plaintiffs claim was possible only because of plagiarism—may result in increased diversions of plaintiffs' sales not only in 1971, but also through 1974, the prospective last year of the forthcoming fifth edition, if not even longer.

## II

■ For plaintiffs to succeed on this motion they must satisfy two burdens. The first is that of establishment of the two elements comprising a prima facie case of copyright infringement; the second is demonstration of the necessity for injunctive relief to protect plaintiff's rights. Should plaintiffs carry their burdens with respect to the Spencer text itself, then the related materials would also have to be withheld from distribution. This does not mean, however, that they would be enjoined even absent any allegation that they infringe their McConnell counterparts. In point of fact, one of the Spencer supplementary materials appears to have no McConnell counterpart. These booklets are not really independent works, but only adjuncts of the text itself, designed to simplify the use of the Spencer text as a teaching tool. At least one is distributed gratis to purchasers of the text. Were the text itself enjoined, the related materials would presumably be voluntarily withheld by the publisher.

■ It need hardly be added that the defendants-authors of the supplementary materials to the Spencer text will not be held personally liable in damages, should any be proved, merely because the text which their works supplement was found to be infringing. Greater elaboration in this regard is unnecessary at the present time.

■■ The first element of a prima facie case is ownership of the copyright. In this regard, defendants have not controverted plaintiffs' claim of ownership of valid copyrights on the McConnell text and related materials; their validity and plaintiffs' ownership will therefore be assumed for these purposes. Herbert Rosenthal Jewelry Corp. v. Zale Corp., 323 F.Supp. 1234, 1238 (S.D.N.Y.1971).

■ The second element is copying. This is normally established indirectly by proof of access and of substantial similarity. Access is also not disputed, at least in so far as the work of Spencer himself is involved. See Kothman and Benz affidavits, supra, and will likewise be assumed proved.

The question, then, is whether the Spencer text is substantially similar to the McConnell text. Even in this regard, defendant admits the existence of certain similarities of form, if not language, between the two works. However, defendants strenuously deny any improprieties in the method of preparation of the Spencer text and related materials.

Rather, they note a variety of other factors in explanation of what they claim to be insubstantial similarities. As a second defense, if the similarities should be found to be substantial, defendants assert that their appropriations were a privileged "fair use" of the fruits of plaintiffs' endeavors.

■ In determining the substantiality of the similarities between plaintiffs' and defendants' texts, the ultimate factor must be actual observation and comparison. This should be done in two ways. Consideration of fine analysis and textual dissection by experts would be relevant to proof of actual copying. However, on the issue of whether the copying went so far as to constitute improper appropriation, i. e., was "substantial," the test is, "whether an average lay observer would find a substantial similarity in the designs, recognizing the copy as an appropriation of the copyrighted work." Concord Fabrics, Inc. v. Marcus Bros. Textile Corp., 409 F.2d 1315, 1316 (2d Cir. 1969); Arnstein v. Porter, 154 F.2d 464 (2d Cir. 1946).

■ Defendants' verbatim duplication of any material part of the McConnell text is not alleged, nor could it be proved. Rather, the allegation is that the "pattern" of the former text has been appropriated. See Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 1930), cert. denied, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931). It therefore becomes incumbent to determine the least generalized level at which similarities become apparent. If the allegedly copied "pattern" in this case should turn out to be plaintiffs' abstract ideas themselves, rather than their concrete expression, then their copyright would not be infringed. Peter Pan Fabrics, Inc. v. Martin Weiner Corp., *supra*, 274 F.2d 487 (2d Cir. 1960). This is because theories and concepts are in the public domain; the copyright laws seek "To promote the Progress of Science and useful Arts," U.S.Const. Art. 1, § 8, not to stifle progress by granting intellectual monopolies.

Defendants give two explanations for the similarities between the works: that they are traceable to common sources, namely, other textbooks, from which the similar parts of both works were developed, and that the common subject matter of both texts, especially as here when it is of a technical nature, compels similarities in expression.

■ In order to document the alleged common sources, defendants trace the origin of each of a variety of claimed infringements to a particular economics text not written or published by plaintiffs. Plaintiffs triumphantly respond by noting that the "common sources" all postdate the initial publication of the first edition of the McConnell text. They conclude that the most defendants can have shown is that the other authors and publishers are co-infringers, along with defendants themselves, of the McConnell text.

This argument may not be entirely sound; a complete refutation of defendants' contention would have to include the demonstration of the precise McConnell origin of each item alleged to be similar and which defendants have attempted to trace to third-party sources. The reason is that priority of publication of a text means little, absent a showing that a particular item actually appeared in the prior editions. It is possible for an author, in revising his text in preparation for a new edition, to incorporate a novel concept or method of expression first developed by someone else.

■ In any event, one of the alleged common sources is the Samuelson text; this work clearly antedates plaintiffs' book. In view of the above, however, it need only be noted that priority of publication, without more, does not prove the existence of a common source any more than lack of priority disproves it.

Defendants' second, weightier argument in support of their contention that any similarities are insubstantial is that the nature of the subject matter dealt with in both texts inevitably restricts their creative discretion. They assert

that the economics professors, who shape the market, desire texts to which their own class notes can be adapted. Their notes, in turn, are the products of long familiarity with what might be described as "Samuelson methodology." These professors are presumptively unwilling to effect a reorganization of their own notes merely to satisfy the whim of a new textbook writer. This is not to say that "everyone is copying Samuelson," but rather that he has profoundly influenced, if not economics itself, then at least the teaching of economics.

In addition to the historical determinants, there are strong internal factors restricting defendants' literary options in creating an economics textbook. A particular style is essential to its success only in the negative sense that a cumbersome or otherwise unreadable style will inhibit market receptivity. Ideally, the style should be neutral; contemporary and inviting to students, and not "stuffy," but nevertheless adaptable to any possible teaching style. A noticeable style would be a drawback; these are not works of fiction.

A final set of restrictions relates to the subject itself. The long history of the development of the discipline has resulted in a large corpus of technical words and phrases whose meanings have been fixed, and of concepts whose importance is generally acknowledged. No professor dealing in the basics could hope to be successful with a radical departure from either the jargon or the substantive professional consensus, on issues where one exists. To be more specific, any introductory text must deal with macroeconomics and microeconomics. They can be presented in either order, or in a melange. But the range of choices is not large.

 The basic question raised by both the "common sources" and "nature of the subject" defenses, as well as that of "fair use," *infra*, is what was the nature of the activity which went into the preparation of the Spencer text. Was it conscientious scholarship, with careful checking of all sources in order to preserve currency and comprehensiveness,

but nevertheless with independent organization and expression; or was it literary larceny by an unprincipled individual seeking to "cash in" on a lucrative market by the fastest and easiest method possible? The conclusion must be, based on all the evidence presented on this motion, but most particularly on my own comparison of the two books, that the evidence fails to demonstrate any actual copying, or other impropriety in the preparation of the Spencer text. We have found no verbatim copying; certain Spencer passages, read after their McConnell counterparts had been read, did give an impression of *deja vu*, but only in the most general way. We are convinced that any similarity between the Spencer and McConnell texts is inadvertent and occurred despite reasonable precautions on defendants' part, and in any event is insubstantial. "Where similarities or identities are relied upon, they must do more than engender a suspicion of piracy; they must establish piracy with reasonable certainty." Wilkie v. Santly Bros., 91 F.2d 978, 979 (2d Cir. 1937), cert. denied, 302 U.S. 735, 58 S.Ct. 120, 82 L.Ed. 568 (1937). Plaintiffs have failed to carry their burden of persuasion of the probability of their success on the merits of this issue; see Oxford Book Co. v. College Entrance Book Co., 98 F.2d 688, 691 (2d Cir. 1938).

This determination makes it unnecessary to discuss defendants' claimed privilege of fair use, should the Court have found the similarities to be substantial. At this juncture we will only comment for the record that it appears to be a colorable defense under Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2d Cir. 1966), cert. denied, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967), the resolution of which may safely be left to a later stage of the action. *See* Higgins v. Baker, 309 F.Supp. 635, 637, 640 (S.D.N.Y.1970).

We also find for the record that while plaintiffs' speed in this action has not been blinding, neither have they slept on their rights. Defendants began their

present course of conduct in 1968, and have not deviated since, so there is no reasonable claim of change of position in reliance upon plaintiffs' restraint. Therefore, for present purposes, which are clearly distinguishable from the circumstances attendant upon the application for a temporary restraining order, neither estoppel nor laches is present. *See* Thomas Wilson & Co. v. Irving J. Dorfman Co., 268 F.Supp. 711 (S.D.N.Y.1968).

Defendants' First Amendment argument, in so far as it is distinguishable from their claim of fair use, can be dismissed as flying in the face of established law. *See* U.S.Const. Art. 1, § 8; 17 U.S.C. §§ 1, et seq., 112.

### III

Notwithstanding the Court's conclusion as to plaintiffs' likelihood of success in the merits, some discussion should be had of their claim of irreparable injury if a preliminary injunction is not issued. It is well established that they need not present the impending injury in elaborate detail. Herbert Rosenthal Jewelry Corp. v. Zale Corp., *supra*, 323 F.Supp. at 1238, but some showing that the equities favor the issuance of the injunction is still required.

As has been noted above, plaintiffs are more aggrieved by the potential future effects of defendants' activities in marketing their text, particularly with respect to the consequences to the 1972 edition of McConnell, than they are about the effects during this academic year. The situation is therefore distinguishable from alleged infringements of shorter-lived goods, such as yard goods. The circumstances of this case will permit greater factual development, and consequently a lesser likelihood of injustice from misapplication of preliminary equitable relief, without irrevocable prejudice to plaintiffs from elapse of time.

It is also doubtful that any relief granted at this time would be of sufficient assistance to plaintiff to outweigh the hardship to defendant. Defendant maintains a "100 percent returns policy"; all unsold texts can always be returned. But by the time this motion was heard on September 20, 1971, the fall semester had begun at most colleges, and the retail sales had already been made by the bookstores. Most books were therefore presumptively in a used condition, and unreturnable. An injunction would have done little besides cause widespread confusion and consequent prejudice to defendant. Since this text is designed for year-long courses, the incidence of selling should be considerably less at the start of the spring semester; the next large sales surge will be in the summer of 1972. Even at that time, an injunction will not prevent the circulation of used copies of the Spencer text.

Finally, there is nothing in the case to dispute defendant Worth's allegations about his corporation's financial ability to respond in damages. His net sales in 1972 [sic—1971(?)] will be close to $2,000,000, and the company is profitable. It is audited by a well-known accounting firm. While it is new to the publishing field, its president has spent his professional life in that area. Despite its newness it has acquired an excellent professional reputation, which should not be destroyed by an unnecessary injunction. Should pre-trial discovery eventuate, and any proof be developed therein to controvert these allegations, some suitable application can be made by plaintiffs at such time.

The Court makes no comment on the fiscal capacity of defendant Spencer to fulfill his indemnification agreement to defendant Worth Publishers, Inc., since the only information on this subject before the Court relates to his prospective royalty income, and this would presumably be recoverable as unlawful profits, wholly apart from any proof of special damages. 17 U.S.C. § 101(b).

Accordingly, plaintiffs' motion is denied in all respects.

So ordered.