**MEREDITH CORPORATION,**
Plaintiff,

v.

**HARPER & ROW, PUBLISHERS, INC., et al., Defendants,**

Brian Sutton-Smith, an Individual and Prentice-Hall, Inc., a Delaware corporation, Additional Defendants on Counterclaim.

No. 73 Civ. 5446 R.O.

United States District Court,
S. D. New York.

May 29, 1974.

Howard Abrahams, New York City, for plaintiff.

Edward A. Miller, James A. Fox, New York City, for Harper & Row.

Lankenau, Kovner, Bickford, Abrons & Beer, New York City, for defendants Mussen, Conger and Kagan.

Hahn, Hessen, Margolis & Ryan, New York City, for Brian Sutton-Smith.

Wayne Carson, New York City, for Prentice Hall.

OWEN, District Judge.

## OPINION

Alleging plagiarism, Harper & Row, Inc., publisher, and Drs. Mussen, Conger and Kagan, authors of "Child Development and Personality", third edition,[1] move to enjoin the sale of a competing textbook "Child Psychology" prepared by Meredith Corporation,[2] published by Prentice-Hall, Inc., with Brian Sutton-Smith as its named author.[3] On the record before me there is not only a showing of a probability of success on the merits, but indeed clear and convincing proof of plagiarism,[4] and the need for immediate relief being established, I grant the preliminary injunction.[5]

Mussen, it appears, has been, and is, not only one of Harper's most profitable college texts but also one of the most widely used child development college textbooks in the United States, with approximately thirty percent of the market. While many child development texts compete for this market, no single text may be said to dominate the field.[6]

In 1971 editors of Meredith decided to publish a textbook in the field of child development. In order to achieve the widest market for its textbook, Meredith ordered a market research study, and thereby identified Mussen's book as the leading child development text in the field. A subsequent internal memorandum reveals that Meredith selected Mussen to serve as the content model "in terms of topics to be included, weighting of topics, and sequencing of the topics." Meredith next prepared initial detailed chapter outlines of Mussen and then rearranged the outlines, often in *haec verba* for distribution to freelance writers engaged to prepare the initial draft of the proposed Meredith text. The freelance writers engaged were not professional psychologists and often had no background in psychology whatsoever.[7]

Each writer hired by Meredith was required to furnish a manuscript of each chapter assigned to him within a period of weeks. Meredith's employees then reviewed the manuscripts and were instructed in writing to call the editors'

---

1. Hereinafter "Mussen".

2. Hereinafter "Meredith".

3. Meredith, demanding a declaratory judgment and other relief, won the "race" to the Courthouse, hence the inversion of the parties.

4. In order to establish their right to the relief requested defendants must first satisfy the two elements comprising a *prima facie* case of copyright infringement; (1) ownership of the copyright and (2) copying which is normally established by proof of access and substantial similarity, McGraw Hill, Inc. v. Worth Publishers, Inc., 335 F.Supp. 415 (S.D.N.Y.1971).

5. Other aspects on this motion are disposed of by my earlier interim memorandum of May 23, 1974.

6. McGraw-Hill Inc. v. Worth Publishers, Inc., *supra*, is not applicable here since the field of child psychology is characterized by a wide divergence among the texts in both the subjects selected, and their organization and approach, unlike the field of economics in which there is a single predominant approach to the materials.

7. One such writer had never taken a course in psychology, and was employed as a full-time speech writer for Exxon Corporation while furnishing several chapters of the Meredith book.

attention to any material omissions or deviations from the Mussen text.[8]

The conscious paraphrasing of Mussen and simultaneous attempt at disguise is revealed in a Meredith memorandum sent to a development editor dealing with the first draft of chapter 10 of the Meredith book. The memorandum notes that a certain discussion of a phenomenon among the Ibo tribe is taken from the Mussen text and states: "can we find another group besides Ibo as this is a dead giveaway?" There was another "dead giveaway." In the Mussen text, numbers appear following certain studies. These numbers enable the read to go to an index at the end of the text and ascertain the author and year of preparation of each such study. One such number was erroneous. The Meredith text uses the same study and names Mussen's "erroneous" author as its source.

The limited participation of Professor Brian Sutton-Smith as "author" of the Meredith book is also significant. He received only a 3% royalty rather than the traditional 15% royalty received by most authors of college textbooks. He did not write the first draft of any chapter of the Meredith book, and had no knowledge of what the writers had done in preparing the first draft. His was but a part-time commitment to the Meredith book which only extended over a six months period.[9]

Professor Sutton-Smith was aware of the manner of the preparation of the materials. Indeed he provided Meredith with the outlines of three Mussen chapters with page references. Further, during his supervisory participation, he wrote in various memoranda to Meredith editors as follows: "In *socialization* . . . My assumption is that you will follow [Mussen] fairly closely . . ." and "Notes on the adolescent chapter . . . Mussen'[s] material is pretty adequate but could be condensed . . ." and "Social Development . . . Mussen, etc. have good coverage of facts, babbling, smiling, crying and sucking. Tho put babbling in third chapter . . ."

At one point he even expressed a fear that plagiarism was being committed in the preparation of the Meredith text.[10] Notwithstanding his concern, the problem was not solved, and perhaps one-third or more of the Meredith book is in my opinion, a recognizable paraphrase of Mussen, third edition. I have set forth in the Appendix related passages of the two texts demonstrating the copying. These are typical and were selected from the some 400 submitted to me for consideration.

■ Meredith, in its memorandum, admits some use of Mussen in the preparation of its text but asserts such use is privileged by the doctrine of "fair use".

8. One memorandum states: "Resist the temptation to impose your own view of the subject matter, the model and the marketing report are the arbiters combined with your own common sense."

9. It appears that normally thousands of hours over several years are required by authors to prepare manuscripts for child psychology textbooks. Together the three authors of the Mussen text spent upwards of 17,000 hours in preparation of their textbook and revised editions.

10. "July 22nd, 1972.
Miss Julie Small,
Editor, Appletone-Century.
Dear Julie,
I find this first draft of chapter 10 totally unsatisfactory; the major reason being that it is an almost direct paraphrase of MCK [Mussen] and G&O. Guidance and hints from such other books, yes; but copying, no. This writer has got to go. I have not felt the others were like this but did a good job of assimilating a diverse mass of material. But this particular effort has illegal overtones and I will have nothing to do with it. While reading this effort I felt the need for a lawyer. This is not what the enterprise was meant to do. Joe Church was telling me the other day how they had to take action against Psychol Today for a similar copying from their text.
I believe I asked you earlier for a very close watch on this type of paraphrasing. I insist again that one of your workers go through the chapters and give us a sentence ·count or some such. Whats the good of losing the whole effort because of this sort of behavior.
Yours sincerely,
Brian Sutton-Smith"

On the record before me the doctrine is hardly applicable.

Fair use is sometimes defined as:

. . . a privilege in other than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner by the copyright.[11]

Originally "fair use" was based on the assumption that the user might copy an *insignificant* portion of protected material while freely using unprotected material. The doctrine then developed to permit *more* than insigificant copying of protected material where such copying was clearly in the public interest and served the underlying purpose of the Copyright Act, to wit:

To promote the Progress of science and useful arts . . . U.S.Const. Article 1 Sec. 8.

Thus, fair use has been recognized as a valid affirmative defense in some cases even where there has been significant copying. The test of whether the use of a significant amount of protected material is fair depends, however, upon many different factors. Nimmer on Copyrights recognizes that there is no absolute standard (p. 645):

Fair use is to be determined by a consideration of all of the evidence, and among other elements entering into the determination of the issue, are the extent and relative value of copyrighted material, and the effect upon the distribution of objects of the original work . . . . Whether a particular use of a copyrighted article, without permission of the owner, is a fair use, depends upon the circumstances of the particular case, and the court must look to the nature and objects of the selections made, the quantity and value of material used, and the degree in which the use may prejudice the sale, diminish the profits, or su-persede the objects of the original work . . . fair use is to be determined by a consideration of all the evidence in the case . . . ." Mathews Conveyor Co. v. Palmer-Bee Co., 135 F.2d 73, 85 (6th Cir. 1943); *Nimmer, supra.*

■ In determining whether the use here is "fair", I conclude the following three factors should be considered: (1) the competitive effect and function of the usage, (2) the quantity of the materials used, and (3) the purpose of the selections made.

As to (1) the competitive effect of the taking, *Nimmer* states (p. 646):

. . . it is believed that the actual decisions bearing upon fair use, if not always their stated rationale, can best be explained by looking to the central question of whether the defendant's work tends to diminish or prejudice the potential sale of the plaintiff's work. This determination must be made not by comparing the media in which the two works may appear, but rather in terms of the function of each work regardless of media.

There is no dispute here that these two textbooks compete for sales in the identical market. Indeed Meredith determined that Mussen was the text to be emulated for this market. In view of the clear evidence of copying on this record, I therefore conclude that the sale of the Meredith book in the same marketplace as Mussen would substantially injure the revenues of the Mussen book.

■ As to (2), the quantity of the materials used, I conclude on the record before me on this motion for a preliminary injunction, that this is not a case of *insignificant* copying. It is clear from even a cursory comparison of the some 400 passages from both texts submitted to me that substantial amounts of Mussen have been taken and para-

---

11. Ball, The Law of Copyright and Literary Property, 260 (1944); Latman, Fair Use of Copyright Works, Study No. 14; Senate Subcommittee on Patents, Trademarks and Copyrights (Comm.Print 1960).

phrased by Meredith.[12] Further, a comparison of the Meredith chapter outlines prepared from Mussen submitted to me demonstrates an extensive taking of the entire structure and topical sequence of Mussen. This is far beyond any copying sanctioned in Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2nd Cir. 1966) upon which Meredith relies. There the Court stated (p. 310):

> The fair use privilege is based on the concept of reasonableness and extensive verbatim copying or paraphrasing of material set down by another cannot satisfy that standard.

See to identical effect Orgel v. Clark Boardman Co., 301 F.2d 119 (2nd Cir.), cert. den., 371 U.S. 817, 83 S.Ct. 31, 9 L.Ed.2d 58 (1962). There the Court rejected the fair use defense and found infringement based on a finding that merely one important section of a law treatise was "strikingly similar" to the copyrighted work and thus the defendant's book was merely a "colorable variation" of the infringed work. The Court stated at p. 120:

> Appropriation of the fruits of another's labor and skill in order to publish a rival work without the expenditure of the time and effort required for the independently arrived at result is copyright infringement.

As to (3) the purpose of the "use", there is no question on this record that it was to enable Meredith to compete with the very text from which the selections were taken (see supra). That this is impermissible hardly needs statement.

Finally, it should be observed that were the result otherwise on this record, some child psychology students would be studying mere paraphrases of scholarship and not the original work of scholarship itself.[13] Further, it is hardly an inducement to someone like a Dr. Mussen to do the years of research and scholarship needed to produce an authoritative text if an untrained freelance speech writer for an oil company may paraphrase major portions and make a competing text out of it.

■ Meredith and Prentice-Hall next urge the defense of laches. If in fact Harper and Mussen had slept on their rights for fourteen months since discovery of possible infringement, they might well have forfeited their right to the extraordinary relief of a preliminary injunction. Gianni Cereda Fabrics, Inc. v. Bazaar Fabrics, Inc., 335 F.Supp. 278 (S.D.N.Y.1971); Irving J. Dorfman, Inc. v. Borlan Industries, Inc., 309 F. Supp. 21 (S.D.N.Y.1969).

However, I conclude that they were not unduly dilatory in asserting their rights. Immediately after discovery in March 1973 of the possibility of infringement they commenced a study of the similarities between the two texts. In September, upon completion of the study which finally took the form of a lengthy exhibit presenting numerous similar portions of the two texts side-by-side, a copy of the exhibit along with notice of infringement was sent to Meredith. In October, Meredith voluntarily withdrew its book from the market. To defendant's knowledge the book did not reappear until January 1974, shortly after the commencement of the present action. Until January 1974, therefore, there could be no claim of delay in asserting rights.

At a pretrial conference before me shortly thereafter in March, Harper and Mussen stated their intention to seek a preliminary injunction. However, at my suggestion they agreed instead to a June 3, 1974 trial date which, in normal

---

12. It is appropriate to note that even a small usage may be unfair if it is of critical importance to the work as a whole and taken by the infringer in order to save the time and expense incurred by the copyright owner. See Colonial Book Co. v. Amsco Book Co., 41 F.Supp. 156 (S.D.N.Y.1941) College Entrance Book Co. v. Amsco Book Co., 119 F.2d 874 (2nd Cir. 1941).

13. And can one doubt that much accuracy can be lost in the paraphrasing when for example the paraphrase changes the "Ibos" to another tribe to avoid a "dead-giveaway?" see supra).

years, would have preceded the peak of the text book selling season.

However, there were at least three developments negating laches in the period preceding the motion. First, extensive discovery in April and May unearthed both documentary and testimonial evidence of intention to copy. Second, it became apparent that the peak selling season for college textbooks this year was earlier than normal, Harper being informed that Prentice-Hall was encouraging its customers to purchase earlier than the usual July-August period because of a possible shortage of paper supplies. Third, it had become likely that because of discovery problems the early June trial date for a permanent injunction was in jeopardy. Thus the possible postponement of the trial threatened to deny Mussen protection from infringement over the entire peak selling season.[14] Earlier protection was therefore needed.

■ As to irreparable injury to Harper and Mussen, I am unwilling, considering the clear and convincing evidence of extensive copying of the Mussen text and the likelihood of injury to the pursuit of genuine scholarship in the academic community, to subject Harper and Mussen to further injury to revenue goodwill or reputation during 1) the present peak selling period [15] and 2) for the period in the future during which the Mussen textbook would remain in use after initial selection.[16] It is established law that where the moving party ". . . has made out a prima facie case of copyright infringement, it is entitled to a preliminary injunction even without a detailed showing of danger of irreparable harm." Uneeda Doll Co., Inc. v. Goldfarb Novelty Co., 373 F.2d 851, 852 (2d Cir. 1967). Since I find on this record *more* than sufficient likelihood of irreparable harm to justify the injunctive relief demanded, and in addition the clearest showing of both the 1) intent to copy and 2) extensive copying, the preliminary injunction is granted.

## APPENDIX

MUSSEN–Page 149

### THE NEWBORN

#### The Initial Equipment

Surprisingly, the newborn is a remarkably capable organism from the moment he begins to breathe. He can see, hear, and smell, and he is sensitive to pain, touch, and change in position. The only sense modality which may not be functioning immediately at birth is taste, but even this sense develops rather quickly. The infant is biologically ready to experience most of the basic sensations of his species from the moment he is born. This is not true of all mammals. Puppies, as the reader may know, are both blind and deaf at birth.

MEREDITH–Page 114

### THE STATE OF THE NEWBORN

#### The Infant's Senses

From his first breath, the child is remarkably well-equipped for life. He can see, hear, smell, touch, and feel pain. All his senses, except taste, are operating immediately, and even taste develops rapidly. From his first moment outside the womb, the human infant can feel most stimuli that adults experience. Unlike many mammals—the puppy, for instance, born

---

14. I note that the timing of the injunction in relation to the normal textbook selling season is a significant factor in determining the necessity for injunctive relief. See McGraw-Hill v. Worth Publishers, Inc., *supra*.

15. It is argued by Meredith, et al, that no injunction is needed since the alleged plagiarism is of Mussen's third edition, and a revised fourth edition has just been published which is new in content and is selling well.

This argument, however seriously proffered, is answered by the question: Why should Mussen's fourth edition have to suffer any competition from a substantially plagiarized version of the third edition?

16. In normal practice, once a text is adopted by a professor for his course, he continues its use for a number of years, being unwilling to revise the teaching notes for his course to dovetail with a different text.

deaf and blind—the senses of the new-born child are in good working order.

## MUSSEN—Page 147

The timing and rate of ossification differs with the various bones of the body and among individuals. Some of the bones of the hand and wrist ossify very early in life, and by the end of the first year most children have developed three of their total (i. e., adult) complement of 28 hand and wrist bones. Other skeletal parts ossify later. The skull of the newborn infant has six soft spots (fontanelles) which ossify gradually and do not disappear until the child is about 2 years of age. Other bones develop still later (98).

As with other aspects of development, there are marked individual and group differences in rates of ossification and skeletal growth. Sex differences in skeletal development favoring girls are present at birth and increase with age. Negro infants are generally advanced beyond white infants (100). Moreover, broad-framed children tend to have a faster rate of ossification than narrow-framed children. Hereditary factors markedly affect the rate and timing of skeletal development, although illness, allergies, and malnutrition may produce disturbances of ossification.

## MEREDITH—Page 119

The baby's bones ossify at different times and different speeds. However, the hardening of some bones is all but guaranteed by certain ages. By 1 year of age, for example, 3 of the 28 hand and wrist bones have already ossified. Other bones, such as those of the skull, take longer to harden. The six soft spots of the infant skull (called fontanelles) do not harden thoroughly until the child is about 2 years old. Still other bones take years more to ossify completely.

Ossification and skeletal growth, like weight and size, also vary markedly among individuals and groups. Sex is one important factor related to such variation. From birth, a girl's bones grow more quickly. Genes also strongly affect the timing and rate of skeletal development. For example, the bones of the broad-framed child ossify faster than those of the narrowly built child. While genes are prime determinants of bone hardening, sickness, malnutrition, and allergies also can affect ossification.

## MUSSEN—Pages 300–301

*Reversal Shifts.* A child capable of using verbal mediators and abstracting can perform successfully in reversal learning or reversal-shift problems (40–44). In these problems, he must learn to switch his responses, to do the opposite of what he has done previously in the same situation. The task involves a simple discrimination, e. g., discovering which of two different squares varying both in size (large and small) and color (black and white) is correct and brings the reward (a marble). The subject is consistently reinforced or rewarded only for choosing in terms of one dimension. Thus, if size is the relevant dimension, choosing the larger of two squares, regardless of its color, will bring a reward. (Color would be irrelevant and must be ignored.) After learning this discrimination, the child is presented with a new problem: he must make a reversal shift and choose the *small* rather than the *large* square to obtain a reward. In another kind of shift, a non-reversal shift, the subject would be required to choose what was previously the irrelevant dimension—that is, to make his choice on the basis of color (black or white) rather than of size.

If children can make mediated verbal responses—if they can say something like "the size is what's important,"—they find it relatively easy to learn this reversal shift. Many nursery school children do not give themselves verbal instructions and have difficulty with reversal shifts; nonreversal shifts are easier for them. Children over 7 make reversal shifts easily, but only about half of the children of kindergarten age

do. Among the latter, fast learners (who probably have greater verbal facility and are more advanced in using verbal mediation) achieve reversal shifts more easily than slow learners, who presumably have less verbal ability (41–43). These findings suggest that ages 5 to 7 may be an extremely important transition period during which verbal mediation is becoming a powerful process in problem-solving.

MEREDITH—Page 315

Once a child learns to use verbal mediators, he also can do well in an area of learning that involves *reversal-shift* problems. The child's basic task in such an exercise is to shift his responses and do the opposite of what he did earlier in the identical circumstance. Earlier he might have been rewarded for picking the larger of two blocks, one black and the other white. The size was the key characteristic, not the color. After the child learns to pick out the larger block regardless of color, the task is changed, introducing the reversal shift. The child must completely reverse his response and pick the *small* block this time. The *non-reversal shift* is another kind of change and demands a different response. This time the child would have to choose the block on the basis of color—previously an irrelevant characteristic—rather than on the basis of size. For example, the white block might be the correct choice.

The child who can make mediated verbal responses—in effect coaching himself by saying, "Look for the size of the block"—has no problem with the reversal shift. Accordingly, children over 7 are adept at reversal shifts. Preschoolers do better at nonreversal shifts because part of their earlier responses are still adequate: half the large blocks are the right color. Among kindergartners, fast learners—who tend to be proficient verbally and, therefore, good at verbal mediation—learn to perform reversal shifts more rapidly than their slower-learning peers. The difference between

kindergarten and first-grade children suggests that in the period between ages 5 and 7 verbal mediation is developing into an effective cognitive tool for problem solving.