**H. C. WAINWRIGHT & CO., Plaintiff,**

v.

**WALL STREET TRANSCRIPT CORPORATION and Richard A. Holman, Defendants.**

No. 76 Civ. 3053.

United States District Court, S. D. New York.

Aug. 19, 1976.

---

Cahill, Gordon & Reindel, New York City, for plaintiff; Stephen A. Greene, Roy L. Regozin, Ira A. Finkelstein, Helene Fromm, New York City, of counsel.

Eaton, Van Winkle & Greenspoon, New York City, for defendants.

## MEMORANDUM

LASKER, District Judge.

H. C. Wainwright & Co. is engaged in the securities business as a broker. As an important adjunct to its brokerage business, Wainwright has for nearly forty years provided financial research for its clients. The roster of those it currently serves numbers more than 900 including most major banks, insurance companies, mutual funds, investment counselors, and pension funds in a variety of countries. 90% of Wainwright's revenues and even more of its profits are earned from the research which it distributes, and to perform which it retains a staff of 80 professionally trained persons.

Wainwright regularly furnishes its clients with detailed and analytical "Research Reports" relating to some 30 industrial areas

and 275 industrial, financial, utility and railroad corporations which represent a "broad cross-section of the economy of the United States, and, as measured by capitalization, account for the bulk of the market value of a typical institutional equity portfolio." [1]

Wainwright copyrights each of its reports by registration with the Register of Copyrights, affixing the classic "©", its name and the year at the bottom of the first page of each report and adding the notice "All rights reserved. No portion of this report may be reproduced in any form without prior written consent." There is no doubt that if Wainwright's reports are copyrightable—a point which Wall Street Transcript Corporation questions—they have been copyrighted.

The Wall Street Transcript is published weekly. Among its features is the "Wall Street Roundup" which consists largely, if not exclusively, of abstracts of reports prepared by institutional and business researchers. It advertises itself to the financial world as a purveyor of institutional research reports in abstract form. The announcements appearing in the widely read and respected Barron's for October 27, 1975 and July 5, 1976 are typical. They advise the reader that the Transcript will furnish him:

"WHAT leading investment houses across the country are saying to their big institutional clients—the big banks, insurance companies, funds, and important foreign clients." (October 27, 1975) (Regozin Affidavit, Page 3)

". . . now you can read 1,000 pages of institutional research in 30 minutes! First thing each week, THE WALL STREET TRANSCRIPT brings you a fast-reading, pinpointed account of heavyweight reports from the top institutional research firms.

"Our WALL STREET ROUNDUP will save you hundreds of hours of reading;

report to you the highlights of thousands of institutional-level. research reports each year; and index every bit of it for you, immediately and continuously, for use whenever you want it. In addition, every account will give you full details as to who wrote the report, the date and the original length. . . ." (Regozin Affidavit, Page 2)

For several months [2] prior to the commencement of this suit, the Transcript has published a number of abstracts of Wainwright reports. These include the reports on FMC Corp., Overnite Transportation, Monsanto Company, Eastman Kodak, Polaroid Corporation and C.I.T. Financial Corporation. Promptly after learning of the publications, Wainwright protested in writing to the Transcript that they violated Wainwright's copyrights. Counsel for the parties attempted responsibly but unsuccessfully to reach agreement as to their respective rights. This suit followed.

Wainwright claims that the publication of the Transcript constitutes actual or substantial copying of its reports in violation of 17 U.S.C. § 1 et seq., as amended, (1970) and moves for a preliminary injunction restraining the Transcript from infringing Wainwright's copyrights. The Transcript argues that: 1) Plaintiff's research reports are not subject to copyright; 2) its abstracts furnish the public information which it has "a right to know", and that they are accordingly protected by the First Amendment; 3) Wainwright is not entitled to protection because by this suit it seeks to suppress "inside information" in violation of the rule established by such cases as S.E.C. v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968) and 446 F.2d 1301 (2d Cir. 1971), cert. denied, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1972); and 4) under the doctrine of "fair use" the Transcript has the right to publish abstracts of Wainwright's reports. We find none of the Transcript's contentions to be sound and accordingly

---

1. Affidavit of Robert L. Meyer, July 9, 1976.

2. It is not clear from the moving papers precisely when the Transcript first published ab-

stracts of Wainwright's reports. The earliest date indicated is "May 1976". (Regozin Affidavit, Paragraph 5)

grant Wainwright's motion for preliminary relief.

## I.

Citing such decisions as *Marvin Worth Productions v. Superior Films Corp.*, 319 F.Supp. 1269 (S.D.N.Y.1970); *Norman v. Columbia Broadcasting System*, 333 F.Supp. 788 (S.D.N.Y.1971) and *Dellar v. Samuel Goldwyn*, 150 F.2d 612 (2d Cir. 1945) the Transcript argues that:

". . . matter which lacks originality and [includes] facts as such are not copyrightable"

and adds

"nor are plaintiff's conceptions, viewpoints or ideas embodied in its research report within the scope of copyright protection."

■ The difficulty with the Transcript's position is that the proposition of law which it states correctly does not apply to the facts of the case. Wainwright's reports, detailed excerpts of which appear below, clearly do not lack originality, and its original analyses and conclusions are without question entitled to copyright protection. The decisions on which the Transcript relies do not hold that such material may be freely copied, as the Transcript claims, but rather, as is explained in detail in part IV below, that a copyright does not grant its holder a monopoly of discussion of the underlying subject matter. Thus, for example, while an historian may not simply rewrite a copyrighted book, he is free to cover the same subject matter in a book growing out of his own independent research. The Transcript does not claim to have conducted any independent research in preparation of its abstracts. To the contrary, it blandly asserts the unsupportable proposition that ". . . independent work, if such be required, is the reading of the . . . Wainwright copyrighted report."[3] Such a theory, if validated, would make a shambles of the copyright law;

copyright would dissolve upon the mere reading of the protected material, and protection would be a chimera. Neither the Constitution nor the statute contemplates such evanescent or worthless protection.

■ Nor is there merit to the Transcript's subordinate arguments that Wainwright's reports do not meet the requirements of the statute because they are neither sold, nor works not reproduced for sale within the meaning of 17 U.S.C. § 12, or that they do not fall within "Class (a)" of 17 U.S.C. § 5 in which their certificates of registration classify them. The affidavit of Robert L. Meyer, a partner in Wainwright and its Director of Research, clearly establishes at Paragraphs 2–8 that furnishing the reports is part of the service for which Wainwright charges a cost to its clients. Moreover, the statute does not require a literal sale, but may be satisfied by a lease, loan or gift of the copyrighted material. See, e. g., *Bartok v. Boosey & Hawkes, Inc.*, 523 F.2d 941, 945 (2d Cir. 1975). Even advertising handouts and illustrations in a catalogue are protected. *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 23 S.Ct. 298, 47 L.Ed. 460 (1903); *Lin-brook Builders Hardware v. Gertler*, 352 F.2d 298 (9th Cir. 1965).

■ There is no greater merit to the claim that the reports are not "books" within the meaning of subdivision (a) of 17 U.S.C. § 5. If they are not—and they appear to be in every respect except the most literal—they are "composite works" or "other compilations". Even greeting cards are registrable under Class (a), *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1110 (9th Cir. 1970), as are machine-scorable answer sheets to tests. *Harcourt, Brace & World, Inc. v. Graphic Controls Corp.*, 329 F.Supp. 517 (S.D.N.Y.1971). Moreover, the copyright office's grants of certificates of registration to the plaintiff indicate that it construes the statute to cover the reports.

---

**3.** Letter of Samuel M. Greenspoon, attorney for the Transcript, to the Court dated July 26, 1976.

## II.

■ The Transcript asserts that it is a newspaper and that in furnishing its readers abstracts of business and industrial reports it is merely giving them the news. More particularly, it claims that the First Amendment, especially as its reach has been construed in the recent decisions of the Supreme Court in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) and *Virginia State Board of Pharmacy v. Virginia Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) assures the public's "right to know" the information contained in the Wainwright reports.

■ The Transcript's ingenious designation of the reports as news is faulty. While the fact of Wainwright's issuing a report on a particular company or industry, and perhaps whether it was favorable or unfavorable, bullish or bearish, may be news, the precise contents of the report are not news—at least if the term is meant to indicate that the material, as is the case of true "news," is in the public domain. The original analytical contents, the style, impressions, estimates, assessments and appraisals of the reports are protected, as is the particular expression of the facts. The public has a right to know the facts, but does not have a right to know them in the particular form in which an author assembles and expresses them.

As to the Transcript's claim that the First Amendment protects the publication of its abstracts, one could dispose of the argument as Judge Croake did in *McGraw-Hill v. Worth Publishers Inc.,* 335 F.Supp. 415, 422 (S.D.N.Y.1971) by saying:

"Defendants' First Amendment argument, in so far as it is distinguishable from their claim of fair use, can be dismissed as flying in the face of established law. *See* U.S.Const. Art. 1, § 8; 17 U.S.C. §§ 1, *et seq.,* 112."

Judge Zampano put it nearly as concisely in *Robert Stigwood Group Ltd. v. O'Reilly,* 346 F.Supp. 376, 383 (D.Conn.1972) *aff'd,* No. 72–1826 (2d Cir., May 30, 1973):

"The short answer to the defendants' absolutist approach to the meaning of the First Amendment is that it is simply not the law. Were the First Amendment to be applied literally, our statutes pertaining to perjury, obscenity, mail fraud, among many other, would constitutionally fall."

■ A further comment is in order. The tension between the First Amendment and the copyright statute which the Transcript professes to discern in such cases as this does not exist. It does not exist because the doctrine of fair use, discussed below, has been precisely contoured by the courts to assure simultaneously the public's access to knowledge of general import and the right of an author to protection of his intellectual creation.

## III.

■ Relying solely on the decisions in *S.E.C. v. Texas Gulf Sulphur Co., supra,* the Transcript contends that "it is a violation of law to utilize insider information in such a way that the general public is excluded therefrom and only plaintiff's customers receive the benefits therefrom."

Even if this characterization of the *Texas Gulf* rule, a case relating only to the purchase of securities, were not over generalized, it would not be applicable to the case at hand.

In the first place nothing in the record supports the unfounded claim that inside information is used in preparation of or is included in the reports. The allegation of such use springs full blown from, and only from, the Transcript's memorandum in opposition, and is categorically denied in Wainwright's reply memorandum with references to Meyer's affidavit at Paragraph 10, which in turn refers to various reports which are exhibits to the complaint. Nothing contained in them appears to support the Transcript's claim and the Transcript has filed no affidavit on the motion, nor furnished any material controverting Wainwright's categorical denial of the use of inside information.

Furthermore, there is serious doubt whether, under the holding in *Blue Chip*

*Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) defendants have standing to assert the defense of the violation of the securities laws which they claim.

IV.

" 'Fair use' is a privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner . ." Ball, Copyright & Literary Property 260 (1944).

The Transcript's major position is anchored in the theory of fair use.

The leading case on the subject in this Circuit is *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303 (2d Cir. 1966). There Judge Moore explained at page 307 that:

"The fundamental justification for the privilege lies in the constitutional purpose in granting copyright protection in the first instance, to wit, 'To Promote the Progress of Science and the Useful Arts' U.S.Const. Art. 1 § 8. (Citations omitted) To serve that purpose, 'courts in passing upon particular claims of infringement must occasionally subordinate the copyright holder's interest in a maximum financial return to the greater public interest in the development of art, science and industry' *Berlin v. E. C. Publications, Inc.,* 329 F.2d 541, 544 (2d Cir. 1964)."

■ The classic instances in which courts have permitted authors to use excerpts from a copyrighted work without the consent of the copyright owner are those of literary criticism and parody of the copyrighted work, history and biography.

"The cases and commentaries attempting to define the quicksilver content of 'fair use,' although varying and overlapping in their definitions, appear to agree that at least four tests are appropriate to determine whether the doctrine applies: (1) Was there a substantive taking, qualitatively or quantitatively? (2) If there was such a taking, did the taking materially reduce the demand for the original copyrighted property? (3) . . . [D]oes the distribution of the material serve the public interest in the free dissemination of information? And (4) does the preparation of the material require the use of prior materials dealing with the same subject matter." *Marvin Worth Productions v. Superior Films Corp.,* 319 F.Supp. 1269, 1274 (S.D.N.Y.1970).[4]

■ Judged by these criteria the Transcript's abstracts do not constitute a fair use of Wainwright's reports. The takings have been substantial in quality, and absolutely, if not relatively substantial in quantity. Compelled by their very raison d'etre to present the *essence* of the Wainwright reports the Transcript abstracts suck the marrow from the bone of Wainwright's work without even the assertion of any independent research by the Transcript. There is, by the nature of an abstract, a special concentration on analyses, projections and conclusions: the elements of greatest value. Moreover, while the takings are not great in relation to the length of the reports they are nevertheless absolutely substantial in quantity.

The following examples are typical of the takings, and illustrate particularly well the remarkable extent of copying:

Abstract

". . . 1976 prospects are strengthened by the magnitude of the increase in industrial and agricultural chemical earnings in last year's recessionary environment."

4. Similar factors, declared to be a codification of existing law are included in § 107 of S. 1361, The General Revision of the Copyright Law pending before Congress. They are:
   1) the purpose and character of the use
   2) the nature of the copyrighted work
   3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
   4) the effect of the use upon the potential market for or value of the copyrighted work.

"And second, he says that likely to aid comparisons this year was the surprisingly limited extent to which the Fiber Division's losses shrank last year."

\* \* \* \* \* \*

". . . one of the most hopeful developments in recent years was the decision by management last year to attempt to negotiate sale of the Fiber Division."

". . . the company could wind up with possibly $100 million, plus a tax writeoff and a sizeable one-time charge against earnings."

". . . the company is now far enough along on the learning curve that additional cost overruns, if any, will be small, the major incremental financial cost to FMC will lie in the determination of what share of the present unreserved overrun is the company's responsibility."

\* \* \* \* \* \*

"Trantum estimates that Overnite Transportation will earn $3 a share this year, compared with $2.03 in 1975 and $2.78 in 1974."

\* \* \* \* \* \*

"Productivity gains are being realized, he believes, and a favorable earnings trend should be maintained this year, with additional gains in 1977 as a result of recent additions to route authority and plans for developing new business between Ohio and the Southeast."

"As for the longer term, Trantum says management must take several steps to improve its uneven earnings performance since 1971. He says it must expand its operating authority to cut its dependence on the Southeast, put greater stress on sales and refine and tighten its system of revenue and expense controls."

"Trantum says progress is apparently taking place in all three areas, but he says it's too early to define the effects of the company's actions on long-term prospects."

### Special Report

"The first of the 'surprises' alluded to above that strengthen 1976 prospects is the magnitude of the increase in industrial and agricultural chemical earnings in last year's recessionary environment." (p. 1)

"The second development likely to aid comparisons this year was the surprisingly limited extent to which the Fiber Division's losses shrank last year. . . ." (p. 2)

\* \* \* \* \* \*

". . . one of the most hopeful developments at FMC in recent years was the decision reached by management late last year to attempt to negotiate sale of the Fiber Division. . . . (p. 4)

". . . FMC would wind up with possibly $100 million, plus a tax writeoff and a sizeable one-time charge against earnings." (p. 6)

". . . the company is now far enough along on the learning curve that additional cost overruns, if any, will be small, and that the major incremental financial cost to FMC will lie in the determination of what share of the present unreserved overrun is the company's responsibility." (p. 7)

\* \* \* \* \* \*

"Earnings (Years ending Dec. 31)
Actual 1974 . . . . . . . . . . $2.78 per share
Actual 1975 . . . . . . . . . . $2.03 per share
Estimated 1976 . . . . . . . $3.00 per share
(p. 1)

\* \* \* \* \* \*

"Productivity gains are finally being realized. . . . Furthermore, with the recent additions of route authority and the planned development of new business between Ohio and the Southeast, the carrier should be positioned to extend the favorable earnings trend into 1977." (p. 1)

"Before Overnite can be expected to significantly improve on uneven earnings performance since 1971, this analyst believes it necessary for management to take several steps: (1) expand operating authority to reduce dependence on the Southeast, (2) place greater emphasis on sales, and (3) refine and tighten the company's system of revenue and expense controls." (p. 1)

"While progress is apparently being made in all three areas, it is still too early to precisely define the effects of these actions on the long-term outlook." (p. 1)
(Regozin Affidavit, Pages 8–11)

There is every reason to believe that the publication of the extracts may materially reduce the demand for Wainwright's services. Furnishing its reports to its clients is an especially valued feature which distinguishes Wainwright's services from other brokers'. The Transcript's infringements impair the value of Wainwright's copyrighted material by making its contents available to other brokerage houses with which Wainwright competes. Moreover the infringements impair Wainwright's ability to publish its own abstracts or to authorize others to do so.

Nor is the distribution of the abstracts necessary to serve the public interest in the free dissemination of information. There is no question here of denial of public access. The Transcript is free to prepare and issue its own reports based on its own research and without use of copyrighted material. However, "[t]he second . . . publisher cannot bodily appropriate the research of its predecessor." *Rosemont Enterprises Inc. v. Random House Inc., supra,* at 310; and "No public need appears which would justify defendants' saving themselves time and trouble at the expense of plaintiffs' copyright." *Marvin Worth Productions v. Superior Films Corp., supra,* at 1275.

Finally, while the preparation of the Transcript's material may "require the use of prior materials dealing with the same subject," such a need frees the Transcript to get such prior materials from the source only—that is, to do its own research—not to lift passages wholesale from Wainwright's independent product under the guise of merely repeating facts or business terms or furnishing news to the public.

In sum, the Transcript's copyings are not protected as fair use of the material.

■ The true nature of the Transcript's abstracts is that of a derivative work. Derivative works are an approved genre under 17 U.S.C. § 7, but may be copyrighted or published only with the consent of the publisher of the underlying work, which of course has not been given here.

## V.

Wainwright has without question made a prima facie showing of infringement of its copyright. The defenses asserted by the Transcript have not been established. In the circumstances Wainwright is entitled to a preliminary injunction to protect its copyrighted property and to shield it from the unmeasurable consequential damage to its brokerage business which could flow from making the contents of its research reports known without cost to competitors, potential clients and the public.

This Memorandum Opinion constitutes the Court's findings of facts and conclusions of law.

The motion for preliminary injunction is granted and a decree is being filed concurrently with the filing of this Memorandum Opinion.