**WAINWRIGHT SECURITIES INC.,**
**Plaintiff-Appellee,**

v.

**WALL STREET TRANSCRIPT CORPORATION and Richard A. Holman,**
**Defendants-Appellants.**

**No. 937, Docket 76-7468.**

United States Court of Appeals, Second Circuit.

Argued April 27, 1977.

Decided June 15, 1977.

---

Eaton, Van Winkle, Greenspoon & Grutman, New York City (Samuel N. Greenspoon, New York City, of counsel), for appellant Wall Street Transcript Corp.

Richard A. Holman, pro se.

Cahill, Gordon & Reindel, New York City (Roy L. Regozin, Stephen A. Greene, Ira A. Finkelstein, Helene Fromm, New York City, of counsel), for plaintiff-appellee.

Before MEDINA, OAKES, Circuit Judges, and MISHLER, District Judge.[*]

MISHLER, District Judge.

This is an appeal from a preliminary injunction entered in the Southern District of New York, prohibiting the defendants-appellants, the Wall Street Transcript Corporation and Richard A. Holman, from publishing in their newspaper abstracts of plaintiff-appellee's copyrighted research reports.

The plaintiff-appellee H. C. Wainwright & Co. ("Wainwright") is a Massachusetts limited partnership, organized in 1868, that is engaged in the institutional research and brokerage business. While the company is registered as a broker-dealer with the Securities and Exchange Commission, Wainwright's specialty, from which it derives most of its profits, is the preparation of in-depth analytical reports on approximately 275 industrial, financial, utility and railroad corporations. These reports, written by analysts employed by Wainwright, examine a company's financial characteristics, trends in an industry, major developments at a company, growth prospects, and profit expectations, and highlight both corporate strengths and weaknesses. The analyst's conclusions and predictions are a major feature of the reports.

Often, a research report requires several months of an analyst's time, some of which is spent interviewing the officials at the company. The reports, which may run as many as 40 pages in length, are used by more than 900 Wainwright clients, including major banks, insurance companies and mutual funds. Wainwright copyrights its reports in accordance with the Copyright Act, 17 U.S.C. §§ 1 *et seq.* (1970 & Supp. 1975).

The Wall Street Transcript Corporation publishes the Wall Street Transcript ("Transcript"), a weekly newspaper concerned with economic, business, and financial news. The appellant Richard Holman is the chairman and sole stockholder of the publishing company, and has, apparently, editorial control of the newspaper. The Transcript's subscribers include colleges, libraries, lawyers, brokers, accountants and corporations. It is available to the public by subscription or at some newsstands.

One of the Transcript's major features is the "Wall Street Roundup," a column consisting almost exclusively of abstracts of institutional research reports.[1] Indeed, in

---

[*] Of the United States District Court for the Eastern District of New York, sitting by designation.

1. The following is a typical abstract by appellants of a Wainwright report, published in the Wall Street Transcript on May 10, 1976:

> W. D. Williams of H. C. Wainwright & Co. says in a Special Report (April 13—7 pp) on FMC CORP. (25) that 1976 prospects are strengthened by the magnitude of the increase in industrial and agricultural chemical earnings in last year's recessionary environment. And second, he says that likely to aid comparisons this year was the surprisingly limited extent to which the Fiber Division's losses shrank last year.
>
> His estimated earnings for 1976 is $3.76 per share compared with earnings of $3.24 per share in 1975.

> According to Williams, one of the most hopeful developments in recent years was the decision by management last year to attempt to negotiate sale of the Fiber Division. He says the company could wind up with possibly $100 million, plus a tax writeoff and a sizable one-time charge against earnings. And, concerning the tanker situation, he writes that the company is now far enough along on the learning curve that additional cost overruns, if any, will be small, the major incremental financial cost to FMC will lie in the determination of what share of the present unreserved overrun is the company's responsibility. (27a).

advertisements in such publications as Barron's, the Transcript promises readers "a fast-reading, pinpointed account of heavyweight reports from the top institutional research firms." (162a).

In 1974, the Transcript began publishing abstracts of Wainwright's research reports. In April, 1976, Wainwright began copyrighting its reports but, despite protests, Transcript continued to publish the abstracts in the Wall Street Roundup. On July 9, 1976, Wainwright began an action pursuant to the Copyright Act, 17 U.S.C. §§ 1 et seq., alleging copyright infringement and unfair trade practices, and seeking injunctive and monetary relief. On August 19, 1976, after a hearing, Judge Lasker granted Wainwright's motion for a preliminary injunction. 418 F.Supp. 620 (S.D.N.Y. 1976). We affirm.

■■■ In this circuit, a preliminary injunction can be granted if plaintiff shows irreparable injury, combined with either a probability of success on the merits, or a fair ground for litigation and a balance of the hardships in his favor. See Sonesta International Hotels Corp. v. Wellington Associates, 483 F.2d 247, 250 (2d Cir. 1973). In copyright cases, however, if probable success—a prima facie case of copyright infringement—can be shown, the allegations of irreparable injury need not be very detailed, because such injury can normally be presumed when a copyright is infringed. Robert Stigwood Group Ltd. v. Sperber, 457 F.2d 50, 55 (2d Cir. 1972); American Metropolitan Enterprises of New York v. Warner Bros. Records, 389 F.2d 903, 905 (2d Cir. 1968); Uneeda Doll Co. v. Goldfarb Novelty Co., 373 F.2d 851, 852 n.1 (2d Cir. 1967); Joshua Meier Co. v. Albany Novelty Manufacturing Co., 236 F.2d 144, 147 (2d Cir. 1956); Rushton v. Vitale, 218 F.2d 434, 436 (2d Cir. 1955) (Clark, J.); see 2 Nimmer on Copyright § 157, at 698.4 n.177 (1976 & Supp.). Wainwright's claim that most of its profits derive from its reports, and Judge Lasker's finding that publication of the extracts "may materially reduce the demand for Wainwright's services," sufficiently show irreparable injury under this standard. We need only consider, then, whether a prima facie case of infringement has been made out. Since Wainwright's reports were copyrighted and since no permission was given for publication of the reports in abstract form, a critical question in determining the existence of a prima facie case is whether the Transcript made "fair use" of the Wainwright reports. See 2 Nimmer on Copyright § 145 (1976).

■■■ The doctrine of fair use creates a privilege "in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner . . . ." Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303, 306 (2d Cir. 1966), quoting Ball, Copyright and Literary Property 260 (1944). For example, a classic illustration of fair use is quoting from another's work in order to criticize it. The principle has most often been applied to works in the fields of science, law, medicine, history and biography. The fair use doctrine offers a means of balancing the exclusive rights of a copyright holder with the public's interest in dissemination of information affecting areas of universal concern, such as art, science and industry. Put more graphically, the doctrine distinguishes between "a true scholar and a chiseler who infringes a work for personal profit." Hearings on Bills for the General Revision of the Copyright Law Before the House Comm. on the Judiciary, 89th Cong. 1st Sess., ser. 8, pt. 3, at 1706 (1966) (Statement of John Schulman).

Judge Lasker found that the Transcript's abstracts did not constitute a fair use of the Wainwright reports because (1) the takings were "substantial in quality, and absolutely, if not relatively substantial in quantity," 418 F.Supp. at 625; (2) publication of the abstracts probably reduced the value of Wainwright's research reports; (3) the public interest in dissemination is not affected since the Transcript is not restrained from researching and preparing its own reports; and (4) such reports could be prepared from original materials. See Marvin Worth Productions v. Superior Films Corp., 319 F.Supp. 1269, 1274 (S.D.N.Y.1970).

On this appeal, appellants argue, as they did before the district court, not only that their use of the reports was a fair one, but that publication of the abstracts of the reports is simply financial news coverage entitled to the protection of the first amendment. They point out that Wainwright reports have been reported as news events by the Wall Street Journal and that these accounts include the analyses and conclusions of the original reports.[2]

The question of the first amendment protections due a news report of a copyrighted research report is a provocative one. Conflicts between interests protected by the first amendment and the copyright laws thus far have been resolved by application of the fair use doctrine. *E. g.*, *Walt Disney Productions v. Air Pirates*, 345 F.Supp. 108, 115 (N.D.Cal.1972); *McGraw-Hill, Inc. v. Worth Publishers, Inc.*, 335 F.Supp. 415, 422 (S.D.N.Y.1971). Some day, legitimate in-depth news coverage of copyrighted, small-circulation articles dealing with areas of general concern may require courts to distinguish between the doctrine of fair use and "an emerging constitutional limitation on copyright contained in the first amend-

ment." Nimmer, *Does Copyright Abridge The First Amendment Guarantees Of Free Speech And Press?* 17 U.C.L.A.L.Rev. 1180, 1200 (1970). *See* Patterson, *Private Copyright And Public Communication: Free Speech Endangered*, 28 Vanderbilt L.Rev. 1161 (1975). But, this is not the case.

 It is, of course, axiomatic that "news events" may not be copyrighted. *Time, Inc. v. Bernard Geis Associates*, 293 F.Supp. 130, 143 (S.D.N.Y.1968). But in considering the copyright protections due a report of news events or factual developments, it is important to differentiate between the substance of the information contained in the report, *i. e.*, the event itself, and "the particular form or collocation of words in which the writer has communicated it." *International News Service v. Associated Press*, 248 U.S. 215, 234, 39 S.Ct. 68, 70, 63 L.Ed. 211 (1918); *see Chicago Record-Herald Co. v. Tribune Ass'n*, 275 F. 797 (7th Cir. 1921). What is protected is the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals facts, his choice

2. According to appellants, the following excerpts appeared in an article in the Wall Street Journal on August 22, 1975:

"Earlier estimates of a full industry profit recovery in 1976 now seem too optimistic" says Daniel W. Starrett, of H. C. Wainwright & Co., "and the horizon on such a development has probably been pushed into 1977." His views were in a special report to clients that reviewed first half results of six major steel companies.

Mr. Starrett sees uneven results flowing from recently announced price increases, which center on the 3.8% average increase set by U.S. Steel. The decision by U.S. Steel to delay price increases on sheet and strip products until Oct. 1, he says, suggests increased pressure on profits of most other steel companies in the current quarter.

Although the analyst is basing his current estimates for the six companies on the assumption that the 3.8% price boost can be realized over the rest of this year, he terms it a "shaky" assumption.

"The profit outlook for the remainder of the year remains rather cloudy. With future pricing perhaps the greatest area of uncertainty," he says.

"Cost increases and sharply reduced operating rates will clearly require some relief if

the industry's near-term profit viability is to be maintained. The extent to which pressure from cut-rate imports and reduced demand will limit or prevent improved price realization cannot be gauged with any confidence."

Mr. Starrett estimates that industry shipments this year will drop to 84 million tons.

Although he believes industry volume could rebound 10% or more next year, he doesn't expect supplies to be tight. "Although cost-price relationships will be the ultimate determinant, it seems unlikely at this early date that industry profits will return to peak 1974 levels next year," he says.

"In the interim, the odds appear to favor more bad news. In general, while quarterly dividend rates don't appear to be in jeopardy, the extra payments adopted by all but U.S. Steel in 1974 might be reduced or eliminated."

．　　．　　．　　．　　．

Mr. Starrett's estimates of per-share net this year: U.S. Steel $8.50 vs. $11.52 in 1974; Bethlehem $5 vs. $7.85; Armco $4 vs. $6.71; Inland $5.50 vs. $7.96; National $3.50 vs. $9.44; and Republic $6 vs. $10.55. His U.S. Steel estimate includes 82 cents per share earned in the first quarter from sale of timberland.

Holman Reply Brief, at 9–10 n.

of words, and the emphasis he gives to particular developments. Thus, the essence of infringement lies not in taking a general theme or in coverage of the reports as events, but in appropriating the "particular expression through similarities of treatment, details, scenes, events and characterization." *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976). In a parallel manner, the essence or purpose of legitimate journalism is the reporting of objective facts or developments, not the appropriation of the form of expression used by the news source.

Here, the appellants did not bother to distinguish between the events contained in the reports and the manner of expression used by the Wainwright analysts. Unlike traditional news coverage, moreover, the Transcript did not provide independent analysis or research; it did not solicit comments on the same topics from other financial analysts; and it did not include any criticism, praise, or other reactions by industry officials or investors. Rather, the Transcript appropriated almost verbatim the most creative and original aspects of the reports, the financial analyses and pre-

dictions, which represent a substantial investment of time, money and labor.[3] *See* Gorman, *Copyright Protection For The Collection And Representation Of Facts*, 76 Harv.L.Rev. 1569, 1578 (1963). *Cf.* Note, *Beyond The Realm Of Copyright: Is There Legal Sanctuary For The Merchant of Ideas?*, 41 Brooklyn L.Rev. 284 (1974).

The copying by the Transcript is easily distinguishable from the reporting of the Wainwright research reports by other publications. The Wall Street Journal articles referred to by appellants, for example, were published a year apart. There apparently was no attempt to provide readers regularly with summaries of the Wainwright reports and there is no indication that the Wall Street Journal launched an advertising campaign portraying itself as a publisher of the same financial analyses available to large investors, but at a lower price. By contrast, the appellants' use of the Wainwright reports was blatantly self-serving, with the obvious intent, if not the effect, of fulfilling the demand for the original work. *See Berlin v. E. C. Publications, Inc.*, 329 F.2d 541, 545 (2d Cir.), *cert. denied*, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964). This was not legitimate coverage of a news event; instead it was, and there is no other

**3.** The extent of the copying is illustrated by the following comparison of the Transcript's abstracts, on the left, and portions of the Wainwright reports, on the right:

". . . 1976 prospects are strengthened by the magnitude of the increase in industrial and agricultural chemical earnings in last year's recessionary environment."

"The first of the 'surprises' alluded to above that strengthens 1976 prospects is the magnitude of the increase in industrial and agricultural chemical earnings in last year's recessionary environment." (p.1)

"And second, he says that likely to aid comparisons this year was the surprisingly limited extent to which the Fiber Division's losses shrank last year."

"The second development likely to aid comparisons this year was the surprisingly limited extent to which the Fiber Division's losses shrank last year . . . ." (p.2)

"His estimated earnings for 1976 is $3.76 per share compared with earnings of $3.24 per share in 1975."

"Earnings (Years ending Dec. 31) . . . Actual 1975 ____$3.24 per share (b) Estimated 1976 __$3.75 per share (c)

\* \* \* \* \*

"(b) including LIFO profit of 20 [cents] per share and 12 [cents] per share benefit

of change in pension funding assumptions.

". . . one of the most hopeful developments in recent years was the decision by management last year to attempt to negotiate sale of the Fiber Division."

". . . one of the most hopeful developments at FMC in recent years was the decision reached by management late last year to attempt to negotiate sale of the Fiber Division . . . " (p.4)

". . . the company could wind up with possibly $100 million, plus a tax writeoff and a sizable one-time charge against earnings."

". . . FMC would wind up with possibly $100 million, plus a tax writeoff and a sizable one-time charge against earnings." (p.6)

". . . the company is now far enough along on the learning curve that additional cost overruns, if any, will be small, the major incremental financial cost to FMC will lie in the determination of what share of the present unreserved overrun is the company's responsibility."

". . . the company is now far enough along on the learning curve that additional cost overruns, if any, will be small, and that the major incremental financial cost to FMC will lie in the determination of what share of the *present* unreserved overrun is the company's responsibility." (p.7)

(146a–147a).

way to describe it, chiseling for personal profit.[4]

Thus, under Judge Lasker's well-reasoned fair use analysis, or, meeting the Transcript on its own ground, under a free speech theory, the appellants have failed to demonstrate that their use of the Wainwright reports either was reasonable or pursuant to legitimate news reporting that implicates first amendment interests.

Affirmed.

4. Section 107 of the revised Copyright Law, P.L. 94–553, effective January 1, 1978, provides that the fair use of a copyrighted work for such purposes as "news reporting" is not an infringement of the copyright. The factors to be considered in determining whether the use is a fair one include:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

Significantly, the legislative history of the revised law suggests that the defense of fair use should be restricted when material is appropriated from a "newsletter" for profit-making purposes:

During the consideration of the revision bill in the 94th Congress it was proposed that independent newsletters, as distinguished from house organs and publicity or advertising publications, be given separate treatment. It is argued that newsletters are particularly vulnerable to mass photocopying, and that most newsletters have fairly modest circulations. Whether the copying of portions of a newsletter is an act of infringement or a fair use will necessarily turn on the facts of the individual case. However, as a general principle, it seems clear that the scope of the fair use doctrine should be considerably narrower in the case of newsletters than in that of either mass-circulation periodicals or scientific journals. The commercial nature of the user is a significant factor in such cases: Copying by a profit-making user of even a small portion of a newsletter may have a significant impact on the commercial market for the work.

H.R. No. 94–1476, 94th Cong. 2nd Sess. 73-74, *reprinted in* [1976] U.S.Code Cong. & Admin. News, p. 5687.