Mary W. CHEEVER, Susan Cheever, Benjamin Hale Cheever, and Federico Cheever, Plaintiffs,

v.

ACADEMY CHICAGO, LTD. d/b/a Academy Chicago Publishers, Defendant.

No. 88 Civ. 3404 (GLG).

United States District Court, S.D. New York.

Aug. 2, 1988.

Fed.R.Civ.P. 11.

**282**

Frankfurt, Garbus, Klein & Selz, P.C. (Martin Garbus, Maura J. Wogan, of counsel), New York City, for plaintiffs.

Kronish, Lieb, Weiner & Hellman (Adam Walinsky, Tab K. Rosenfeld, of counsel), New York City, for defendant.

### OPINION

GOETTEL, District Judge:

John Cheever was an American writer of fiction, primarily short stories. His first short story, *Expelled*, appeared in the New Republic magazine of October 1, 1930. It was a personal account based on his recent expulsion from a private school. During the next fifty or so years, he wrote and had published more than a hundred stories. Most of these appeared in magazines, particularly the New Yorker, although several collections of his stories were published in book form culminating in a large volume entitled *The Stories of John Cheever*, published by Alfred A. Knopf, Inc. in 1978. The book, almost 700 pages in length, contained sixty-one stories, all of which were written after Cheever's discharge from the Army at the end of World War II. Chosen as a Book-of-the-Month Club selection, and a major literary event, it won a Pulitzer Prize for literature and, along with his four earlier published novels, secured Cheever's place as a major American literary figure.[1]

Cheever died in 1982 at the age of 70, leaving a widow, Mary W. Cheever, and three children, Susan, Benjamin and Frederico. His widow serves as his literary executor. With respect to copyrights that expired following her husband's death (and there were three or four of them), she renewed them in her own name. The children, except for Frederico, who is a lawyer, are involved in various literary pursuits, some of which involve the life and letters of John Cheever.

Franklin H. Dennis is a literary promoter and editor. He presently does much of his work for Academy Chicago Publishers ("Academy Chicago"),[2] a small publishing house in Chicago specializing in literary works of limited popular appeal but of purported cultural value. Dennis was aware that there were a number of the short stories of John Cheever that had never been collected in book form. During the summer of 1987, through a mutual friend, he obtained an introduction to Benjamin Cheever. Dennis described Academy Chicago to Ben in such a way that the younger Cheever thought that it was a university press associated with Chicago University. Dennis told Cheever that he thought a book

---

1. His first novel, *The Wapshot Chronicle*, won a 1958 national book award, and in 1965 Cheever received the Howells Medal for Fiction from the National Academy of Arts and Letters.

2. This is a trade style. The corporate owner is Academy Chicago, Ltd.

publishing some of the uncollected stories of his father would be well received and that Academy Chicago would be interested in publishing such a work. It was agreed that the Cheevers would evaluate the stories and decide which were worthy of inclusion.

Neither Ben Cheever nor Dennis knew precisely how many uncollected stories there were or the precise ownership of the copyrights, but they were aware that Mary Cheever held many of the copyrights and that various magazines held the lion's share of the remainder. Ben Cheever agreed to speak to his mother about the project. Thereafter, Dennis wrote several letters to her promoting the idea. In his first letter of July 10, 1987, Dennis wrote, *inter alia:*

> Academy Chicago looks forward to disucssing [sic] with you and and [sic] other family members such questions as locating the stories, deciding on those appropriate for publication, resolving copyright questions, the introduction and the foreword.

> The publishers underscore their concern with producing a volume—or even volumes—which meet your collective approval. I mean, in particular, matters of format and design. Academy Chicago, of course, will take on all editorial, copyright and production work.

> Although Academy Chicago, a high quality, literary publisher, cannot afford a large advance, they will pay full royalties on all the stories in the volume(s) irrespective of their copyright status.

Thereafter, Dennis met again with Ben Cheever, and the following month Jordan Miller, an officer of Academy Chicago, sent Mary Cheever a proposed publishing agreement. The publishing agreement was a printed form designed for use with respect to new works in progress. It did not lend itself to easy adoption for a project such as that envisioned.[3] The agreement, as mailed, was to be between the Estate of John Cheever and Franklin H. Dennis, as authors, and Academy Chicago, as publisher. The tentative title of the work was *The Uncollected Stories of John Cheever.* The publishing agreement, as prepared by Academy Chicago, stated in paragraph two: "The Author will deliver to the Publisher on a mutually agreeable date one copy of the manuscript of the work as finally revised by the Author and satisfactory to the Publisher in form and content." The remainder of the agreement had the usual provisions applicable to the publication of a newly created work, including the provision that the book would be "copyrighted in the name of the Author," as well as two typed-in provisions concerning an advance of $1,500.00, with the further provisions that half of it would not be payable until publication and that payments would be divided between the Estate of John Cheever and Franklin Dennis. In addition, the agreement provided that it would be construed under the laws of Illinois and that no suit or any cause of action arising out of or relating to the agreement would be filed except in Chicago, Illinois.

When Mary Cheever received the agreement, she passed it on to her literary agent, International Creative Management, Inc. The agent made certain changes, the most pertinent of which were to substitute Mary W. Cheever for the Estate of John Cheever and to attempt at other places to distinguish between Mary Cheever as the author and Franklin Dennis as the editor. In addition, paragraph two was revised to read as follows: "The Author will deliver to the Publisher on a mutually agreeable date one copy of the manuscript of the Work as finally arranged by the Editor and satisfactory to the Publisher in form and content." The provision concerning copyrighting in the name of the author was changed to be in the name of Mary W. Cheever. As so amended, Mary Cheever signed the agreement, as did Dennis and the publisher.

Mary Cheever signed the agreement upon the recommendation of her agent, as

---

**3.** Dennis wrote Mrs. Cheever, noting:
Academy Chicago obviously views the particulars of the contract as appropriate. But you should understand that the document is intended primarily to get things underway, and that Academy Chicago expects to discuss the terms in detail.

well as her prior conversations with her son Ben. She envisioned a rather modest work containing only a limited number of stories with a small printing. She believed that, as the author who was supposed to deliver a manuscript, she would have control over which works would be included. She was aware that her husband considered his early stories inferior and did not want his literary reputation sullied by their collected publication.

Academy Chicago developed a different perspective.[4] There were almost seventy stories which had never been published in book form, albeit most of them were the early works of Cheever (pre–1947) which both he and his family viewed as being inferior to his subsequent works. In light of the tentative title, *The Uncollected Stories of John Cheever*, and the author's literary reputation, Academy Chicago believed that it had found a gold mine in both the literary and financial senses.

In December of 1987, Dennis had his first meeting with Mary Cheever. He dropped off two, spiral-bound volumes of uncollected Cheever works.[5] The photocopies were difficult to read and Mrs. Cheever made no effort to go over them. She did supply Dennis with an additional story which she had from another collection. She passed on the books to her son Ben. Dennis also left with her five books, two of which were published by Academy Chicago, and all of which were purportedly of cultural value but not for mass publication. This confirmed Mary Cheever's view that Academy Chicago was engaged in a limited project which was far from completion. Ben Cheever, however, in discussions with Dennis, began to have a better appreciation for the substantial scope of the project as viewed by Dennis and his publisher. Cheever brought his own literary agent

into discussions with Dennis at a meeting at the Algonquin Hotel in Manhattan in January of this year. It soon became apparent that there were substantially different views concerning the ultimate publication of the proposed work.

Mary Cheever did not deliver a manuscript to Dennis or the publisher, nor did she advise either which works she deemed suitable for inclusion.[6] On the other hand, they did not ask her opinion as to what should be included. Instead, they prepared galleys of a manuscript containing all of the uncollected stories, some 68 in number, most of which were written prior to World War II, with an introduction by Professor Scott Donaldson (who had just written a biography of John Cheever). They did not give the Cheevers a copy of the proposed work.

Based on the advice of Ben Cheever and his literary agent, the Estate of John Cheever retained attorneys who, on February 17, 1988, wrote Academy Chicago claiming that the publishing agreement was obtained through fraudulent representations, asserting that Dennis and his publisher were incapable of performing their obligations, and threatening suit unless Academy Chicago confirmed that it did not intend to publish any of the works of John Cheever. Academy Chicago and Dennis responded by commencing an action in an Illinois state court in Chicago seeking an adjudication of rights. A few months later, the Cheevers responded by commencing this action in this district, suing for copyright infringement and unfair competition under federal law. By this point they were aware that the proposed work contained all of the uncollected stories as well as the Donaldson introduction, which the Cheevers found offensive.

4. This appears due to the fact that Dennis, as intermediary, was interested primarily in keeping both parties satisfied rather than in perfect harmony.

5. It subsequently developed that two of these stories had, in fact, been published in book form, but as parts of the novels of Cheever. Later, Dennis found an additional handful of stories.

6. Dennis did get approval from her for the publication of one article written by Cheever entitled, *Why I Write Short Stories*. That article had been published in Newsweek following publication of the prize-winning book, *The Stories of John Cheever*.

The plaintiffs in this action are Mary Cheever and her three children. The children allegedly have rights in several of the copyrights renewed by Mary Cheever following her husband's death.[7] The plaintiffs seek a preliminary injunction, since it appears that the defendant will be publishing the proposed work in a couple of months. Expedited discovery was ordered. The defendant moved to dismiss this action pursuant to Fed.R.Civ.P. 12, both for failure to state a cause of action and because the forum-selection clause in the contract dictated that all litigation arising from this transaction be initiated in Illinois. This court denied that motion in *Cheever v. Academy Chicago Ltd.*, 685 F.Supp. 914 (S.D.N.Y.1988).[8] We noted that there are two critical issues between the parties, the first being whether Mrs. Cheever intended, in the publishing agreement, to convey to the defendant all her copyrights in the uncollected stories of John Cheever. The second issue is whether the children are joint holders of the copyrights and, if so, whether their rights could have been conveyed under the publishing agreement by their mother. We observed that the defendant had a strong argument that the forum-selection clause in the publishing agreement required that these matters be litigated in Illinois and that, since there was already pending such an action, the issue should be determined by the Chicago court. Since the claims in the amended complaint in this action concern copyrights in existing works, however, and since the publishing agreement makes no reference to those copyrights (but only to the copyrighting of the new collection of the stories), the plaintiffs are not necessarily prevented by the forum-selection clause from asserting their copyright claims in this action.[9]

Academy Chicago pressed for an early trial in Chicago and one is now tentatively scheduled for next month. In the interim, however, the plaintiffs persisted in bringing on their motion for a preliminary injunction. Two days of evidentiary hearing were conducted. The testimony of the pertinent witnesses, with one exception, was heard.[10] This opinion constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## THE MOTION FOR A PRELIMINARY INJUNCTION

The standards which govern the granting of a preliminary injunction in this circuit are well established. A plaintiff seeking such relief must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam), *cited with approval in Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983).

When dealing with claims of copyright infringement, irreparable injury ordi-

7. Franklin Dennis originally was named as a defendant in this action. The complaint was amended to drop him, thereby creating diversity jurisdiction, as well as federal subject matter jurisdiction. The original complaint raised issues concerning the publishing agreement which are before the state court in Chicago. The complaint was amended to drop those issues.

8. The legal theories of the complaint and certain of the facts are set forth in greater detail in that opinion and will not be repeated herein.

9. The complaint also contains a claim of false designation of origin in that the works selected are not, as purportedly implied by the defendant, those authorized or approved by Mrs. Cheever. Thus, plaintiffs allege, the proposed work is misleading to the public. As will be discussed *infra*, that claim alone would, in all probability, be insufficient to justify dual litigation.

10. An important potential witness is Maggie Curran, formerly of International Creative Management, Inc., who made certain of the changes in the publishing agreement and upon whose advice in signing the agreement Mary Cheever had relied. Ms. Curran is no longer working as a literary agent and the defendant reported that it had been unable to ascertain her present whereabouts. After the hearing of this matter, we were advised that Ms. Curran had been located and deposed, but the transcript has not been submitted by the parties.

narily can be presumed. *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94 (2d Cir.1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). The defendant concedes that if the court finds a copyright infringement a preliminary injunction should issue. Consequently, we turn to the substantive issues presented by this motion.

### 1. Likelihood of Success

■ There are two interrelated theories by which plaintiff Mary Cheever would be entitled to a decision on the merits. The first is that her rights under the publishing agreement are being violated by the publication of a manuscript which she did not submit. The second would be that the publication of the proposed work would violate the copyrights which she holds on the various short stories.[11]

As noted above, the publishing agreement makes no provision with respect to the existing copyrights on the stories, all of which previously have been published, albeit not collected.[12] The defendant argues that to the extent that Mary Cheever holds the copyrights to works to be included, she implicitly agreed to assign or license for publication those rights to Academy Chicago. Mary Cheever responds that any such implicit agreement is subject to her right as the author to determine what will be in the manuscript which is to be published. Defendant, in return, responds that the publishing agreement does not give her such control. This, unfortunately, is the prime contract issue before the state court in Chicago. To that extent, therefore, the existing copyright dispute is dependent upon contractual interpretations and the agreement, by its terms, provides that such interpretations should be rendered by a court in Illinois.

Were we to rule on the contract issue, it would appear that Mary Cheever has a substantial likelihood of succeeding. The contract expressly provides that she deliver a manuscript. The testimony made it clear that both before and after the execution of the publishing agreement it was understood by Mary Cheever and Dennis (defendant's representative) that she would have control over which stories would be included in the proposed work. Since she has not prepared such a work or designated which stories should be included, it appears to this court that she should prevail on the contract claim. That claim, however, is before the state court in Chicago, and we do not believe that we have the jurisdiction to grant an injunction based upon the ruling of another court which has not occurred.

If the Chicago court should rule that the proposed publication accords with the intent of the publishing agreement, then the issue of copyright violation would come to the fore; but it is difficult to resolve that issue completely and satisfactorily without first knowing the basis and reasoning of the Chicago court's decision. We believe it clear that Mary Cheever impliedly agreed to grant licenses for the copyrights she holds in the short stories that were to be included in the work. It was never determined by her which works would be so included, but it is reasonable to conclude that she did not anticipate a large number of works. She received an advance of only $337.00.[13] No specific license was granted

---

**11.** Of the 68 stories proposed for inclusion, she is the registered copyright holder on more than half.

**12.** Paragraph 12 of the agreement does state: "The Work has not been previously published in book form; that all rights conveyed to the Publisher hereunder are free of encumbrances; that the Work does not violate any copyright or any other right and contains nothing libelous, obscene or otherwise unlawful." That provision also provided that the author will compensate the publisher for any sums resulting from a breach of such warranties. The customary provision that the author will obtain at his or her own expense written permissions for other published and unpublished works incorporated into the book was contained in the printed form (paragraph three), but this paragraph was eliminated in its entirety.

**13.** The work which the defendant proposes to publish has already received a paperback, secondary-right advance of $224,000.00. Although Dennis early on represented to Mary Cheever that Academy Chicago could not afford a large advance, the disparity between these figures may to some extent be indicative of the distinc-

with respect to any of the Cheever works, with the exception of a non-fiction piece mentioned *supra* note 6. The publishing agreement makes no attempt to identify how many or which works were to be included. As indicated above, there is no specific license of copyrights in the publishing agreement; rather, it is an agreement to publish a compilation or anthology to be created later by Mary Cheever.

Defendant's principal argument that all of the uncollected works were to be licensed stems from the tentative title, *The Uncollected Stories of John Cheever*. The evidence presented to this court makes it clear that the tentative title has no significance with respect to the rights being conveyed. A tentative title is just that—something that could be and usually is changed prior to final publication. Moreover, for the title to carry the meaning the defendant attempts to import to it, it should have been *The Complete Uncollected Stories of John Cheever*.

Defendant also argues that the publishing agreement should be interpreted as an agreement to license all uncollected stories since there could be no "book" if the language were interpreted otherwise. The proposed work is unusually long for a collection of short stories (534 pages, not including the introduction and editor's note). The rights to more than thirty of the stories are not controlled by the Cheevers. A book of more than 200 pages could easily be prepared from them. Indeed, the earliest collections of Cheever's stories (prior to the Pulitzer Prize-winning *The Stories of John Cheever*) were significantly shorter.

It is simply unreasonable to conclude that the intent of the publishing agreement was that Mrs. Cheever would license all of the uncollected stories of John Cheever to the defendant for publication. At the time the agreement was entered into, neither party knew precisely how many stories there were or who held the rights to them; they did know that many of the uncollected stories belonged to the magazines which first published them, or they were in the public domain. The publishing agreement

itself is, at best, an ambiguous document, and it is particularly unenlightening on this point. To that extent, it should be construed against the defendant whose form it was. Restatement (Second) of Contracts § 206 (1979). This publishing agreement stands in stark contrast to the agreement used by Knopf when it published *The Stories of John Cheever*. In that instance, the author put together the stories which were to be published and delivered two copies of the manuscript to the publisher. The works to be published and the relative rights of the parties in the work were spelled out in detail. Cheever warranted that the works he had selected had not been published before in book form and that, to the extent that he incorporated copyrighted material, he would procure, at his expense, written permissions to reprint. No such undertaking was made here. Consequently, even if the defendant prevails on its contractual claims in the Chicago litigation, it would seem likely that one (Mrs. Cheever) or all plaintiffs will prevail on the copyright infringement claim before us.

### 2. Should a Preliminary Injunction Issue Prior to Conclusion of the Chicago Litigation?

We previously indicated our belief that the contract issues (which, pursuant to the forum-selection clause, are pending in Chicago) should be determined before this suit is adjudicated. The plaintiff, however, has sidestepped this sequence by moving for a preliminary injunction before the contract case could be tried on its merits in Chicago. The plaintiff proffers several justifications for anticipatory action by this court.

The first is that only a federal court has copyright jurisdiction. That is undoubtedly true, but the copyright issues need never be reached if Mary Cheever prevails on the contract issues in Chicago.

■ The plaintiffs' second argument is that they have asserted unfair competition claims (deriving from defendant's allegedly false representations as to the nature of the proposed book's contents) under section

---

tion in the number of works the respective parties expected to be licensed.

43(a) of the Lanham Act, 15 U.S.C. § 1125(a). We know of no impediment to the assertion of those claims as counterclaims in the Chicago litigation. *See* 28 U.S.C. § 1338 (federal courts generally have exclusive jurisdiction over claims arising under federal copyright law, but not so over unfair competition claims arising under the Lanham Act). Moreover, the defendant says it has agreed to all of the plaintiffs' demands in that regard and that the only dispute remaining between the parties is money.[14] We do not see the existence of the Lanham Act claims, to the extent that they persist, as requiring a preliminary injunction at this time.

■ Plaintiffs' final argument concerns the fact that the Cheever children are not signatories to the publishing agreement and are not parties in the Chicago action. It is claimed, therefore, that the existence of the Chicago litigation should not retard progress in this case. The original copyright term on the stories in question was twenty-eight years. They came up for renewal after the author's death. The right to renewal of copyrights does not pass under the usual rules of testamentary or intestate succession. Rather, the second proviso of 17 U.S.C. § 304(a) vests such rights automatically in the "widow, widower, or children." Although this language is susceptible of the interpretation that the children get an interest only in the absence of a surviving spouse, the Supreme Court concluded to the contrary in *De Sylva v. Ballentine*, 351 U.S. 570, 580, 76 S.Ct. 974, 979, 100 L.Ed. 1415, *reh'g denied*, 352 U.S. 859, 77 S.Ct. 22, 1 L.Ed.2d 69 (1956) (holding that widow and children share as single class).

In fact, the copyrights to the three disputed stories were renewed solely by Mary Cheever, the author's literary executor. It is clear that when only one valid claimant renews the copyright, he or she holds the benefits of the renewal as a constructive trustee for all others who could have claimed renewal rights. *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 268, 269 (2d Cir.1944). That said, a Senate report on the subject notes that although "the claimant of record holds legal title to the renewal, ... the exact nature of the rights of unregistered claimants is unclear." Comm. on the Judiciary, Subcomm. on Patents, Trademarks, and Copyrights, 86th Cong., 2d Sess., Study on Copyright Law Revision No. 31 (renewal of copyright) 177 (Comm. Print 1961).[15] Professor Nimmer argued that, under usual trust principles, only the constructive trustee should be entitled to deal with the work as the holder of legal title. There is, however, authority to the contrary. *See generally* 2 M. Nimmer & D. Nimmer, Nimmer on Copyright § 9.05[E] (1988) (discussing this issue).

We agree with Professor Nimmer that, from a pragmatic perspective, it is better to treat only the registered copyright owner as holding legal title since prospective purchasers would have no way of determining whether and to whom the owners have transferred copyrights. It is not, however, necessary for present purposes to resolve this problem. Defendant acknowledges that the children have an equitable beneficial interest. In the present suit they have joined with the registered legal owner, their mother. Whether they could independently maintain a copyright infringement suit is, therefore, irrelevant. Clearly, Mary Cheever could license the copyright interests that she holds, albeit if the children also have an interest she cannot confer an exclusive license and she would hold any royalties received therefrom as constructive trustee for the entire class. Since it is apparent that only the federal courts can deal with copyrights, the children's absence

---

**14.** It may well be that many of the more altruistic arguments concerning the literary reputation of the deceased, John Cheever, are secondary to plaintiffs' interest in securing a larger share of what may be substantial sums of money. In that vein, we note that the Cheevers' counsel believes that sales from the proposed book, hard- and softcover, will run into the millions of dollars. The mere existence of these financial incentives, however, does not detract from the validity of the Cheevers' claims.

**15.** The study noted that this question was raised but deliberately left open by the Second Circuit in *Marks Music*, cited above.

from the Chicago litigation is irrelevant. Rather, we have come full circle and return to the crux of the problem bedeviling this court—to wit, the interrelationship between the contract and copyright claims and our inability to divide them for resolution. Thus, although for the reasons set forth *supra* subsection (1) plaintiffs are entitled to some form of preliminary relief, the comprehensiveness of that relief must be fashioned with a full appreciation for the unique legal posture in which this case presents itself.

### Conclusion

The overarching consideration in granting preliminary relief is, of course, to preserve the status quo. With that salutary purpose in mind, we believe the prudent course in this case is to temporarily enjoin the publication of the work in question pending a decision by the Chicago court on the contract matters. When such a ruling has issued, we will revisit this question to determine if, in light of the Chicago decision, further preliminary relief is necessary or warranted on the basis of the copyright claims, which are solely before this court.

Defendant also moves for sanctions under Fed.R.Civ.P. 11 because, in the words of defendant's brief in support of this motion, "the children's claims have been advanced to subvert the Chicago court's jurisdiction and to contrive jurisdiction in this court." The plaintiffs respond by cross-moving for Rule 11 sanctions on the basis of defendant's purportedly baseless application for Rule 11 sanctions.[16] Neither party is entitled to Rule 11 sanctions with respect to this uncertain but relatively tangential issue. Both applications, therefore, are denied.

SO ORDERED.

---

**16.** Unfortunately, this predictable—though often puerile—ploy is becoming an established part of federal motion practice (or malpractice, in its non-legal sense, as the case may be).