OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

| | |
|---|---|
| OPINION | : |
| | : No. 88-1241 |
| of | : |
| | : JUNE 8, 1989 |
| JOHN K. VAN DE KAMP | : |
| Attorney General | : |
| | : |
| RONALD M. WEISKOPF | : |
| Deputy Attorney General | : |
| | : |

THE HONORABLE WILLIAM J. CRAWFORD, COMMISSIONER, DEPARTMENT OF SAVINGS AND LOAN, has requested an opinion on the following question:

May the Department of Savings and Loan copy and furnish to other governmental agencies, without the permission of the copyright holder, copyright protected working papers and other documents that were prepared in connection with an audit of a savings and loan association and which were received by the Department in the normal course of the performance of its statutory duties?

CONCLUSION

The Department of Savings and Loan, through its Commissioner, may copy and furnish to other governmental agencies without the permission of the copyright holder, copyright protected working papers and other documents that were prepared in connection with an audit of a savings and loan association and which were received by the Department in the normal course of the performance of its statutory duties.

ANALYSIS

Under California's Savings Association Law (Fin. Code, div. 2, § 5000, et seq.), every savings and loan association doing business in this state must have an annual audit made of its books and accounts at its own expense, and must thereafter file the audit report, together with certified financial statements, with the Savings and Loan Commissioner (§ 8156, subd. (a); § 8157, subd. (b)), the chief officer of the state Department of Savings and Loan (§§ 5104, 8000). The Commissioner may prescribe the scope of that audit and may also require the auditor to furnish additional information to that contained in the audit report. (§ 8157; cf. § 8156, subd. (b).) Each association, and such of its subsidiaries as the Commissioner may require, is also required to make and file a verified annual written report in a format prescribed by him or her. (§ 8150.) Those entities must

1.                                                                                88-1241

also make and file such other reports as the Commissioner may from time to time deem necessary. (§ 8151.)[1/]

Any information acquired by the Commissioner or the Department in the performance of its statutory duties is confidential (§ 8009, subd. (a)), but the Commissioner may disclose it on a limited basis to other governmental agencies under section 8009, subdivision (b) of the Savings Association Law, which provides as follows:

"The commissioner may furnish information relating to the condition or operation of any association ... to state and federal authorities that supervise financial institutions, to state, local and federal law enforcement agencies, and to state agencies engaged in the investigation of unsafe or unsound business practice." (§ 8009, subd. (b).)

The Savings Association Law thus contemplates that certain state, local, and federal agencies may be involved in taking action with respect to irregularities that the Department may find with a savings and loan association in the course of performing its statutory duties. The facts prompting the present question are that one auditor has recently claimed that the audit plan, certain working papers, and other documents that it prepared in connection with a required audit of an association are copyrightable materials and may not be reproduced by the Department and given to those agencies.[2/] The number of documents for which copyright protection is claimed is voluminous, forming a pile nearly six feet high.

In spite of their variety and number, we will assume that the materials are in fact proper subjects for copyright protection except as stated otherwise. We will also assume that either the auditor or the savings and loan association in question is in fact the "holder of the copyright" under the Copyright Act. (Cf., §§ 101, 201(b) ["work made for hire"].) Neither assumption will affect our ultimate conclusion. That will rest instead on the ground that copying and furnishing the materials in question would be a "fair use" of them and that therefore no infringement of copyright takes place by that activity.

---

1. The general supervision of the Department conferred by the Savings Association Law actually extends to all (1) associations (cf. §§ 5102, 5205 [certain savings banks]); (2) savings and loan holding companies, (3) service corporations (cf., § 5119); and other persons subject to the provisions of the law. For simplicity we will use the term "association" as a rubric to cover all entities over which the Savings and Loan Commissioner has jurisdiction. (Cf. § 8050.)

2. As we understand it, an "audit plan" is the "scheme" or "marching orders" that are prepared by an accounting company for its auditors to follow in connection with a particular audit. The "working papers" are the detailed numerical information that the auditors come up with when they follow the plan and audit the company. We understand that a "blue back" is then prepared, i.e., a document in which the auditors present problems, including problems in accounting treatment that they have encountered, to the management of the company they are auditing. Thereafter a final audit report is prepared, together with a "management letter" when appropriate.

1. The Copyright Act

Section 102 of the Copyright Act of 1976[3] declares copyright protection to "subsist" in accordance with its terms in "original work of authorship" fixed in any tangible medium of expression from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. (§ 102, subsec. (a).) As is pertinent herein, the term "original works of authorship" is defined to include "literary works" (*ibid.*), a term which "does not connote any criterion of literary merit or qualitative value" (H.Rept. at 54; S.Rept. at 53), but rather "pertains to the literary ... form in which [an] author expressed intellectual concepts." (H.Rept. at 56; S.Rept. at 54.)[4] The term is defined in section 101 of the Act to include

"... works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects ... in which they are embodied." (§ 101.)

Also pertinent is section 103 of the Act which specifically provides that "the subject matter of copyright as specified by section 102 includes compilations...." (§ 103, subsec. (a).) A "compilation" is defined as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." (§ 101.) It is thus a work which "results from a process of selecting, bringing together, organizing, and arranging previously existing material of all kinds, regardless of whether the individual items in the material have ever been or ever could have been subject to copyright." (H.Rept. at 57; S.Rept. at 55; compare, "derivative work.") Many of the documents about which question is raised undoubtedly are "compilations" and "literary works."

A threshold question exists, however, as to whether any particular document is an "original work of authorship" so as to merit copyright protection in the first place.[5] As mentioned at the outset, because of the volume and variety of the documents involved, we cannot give a definitive answer to that question and so will simply assume that all of the documents are in fact

---

3. Public Law 94-553, title I, October 19, 1976 (90 Stat. 2598), codified as title 17 of the United States Code, entitled "Copyrights." Reference to sections of the Copyright Act in this letter will be to the Act as it is codified in that title.

4. The Report of the House Committee on the Judiciary on the Copyright Act (No. 94-1476; 94th Cong. 2d Sess.), is cited as H.Rept. It can be found, with references to its pagination, in [1976] U.S. Code Congressional and Administrative News (vol. 5) at pages 5659-5809, and without such reference following the appropriate sections of title 17 of the West's annotated version of the United States Code (U.S.C.A.). The corresponding Report of the Senate Committee on the Judiciary (No. 94-473), is cited as S.Rept.

5. E.g., compare *H. C. Wainwright & Co.* v. *Wall St. Transcript Corp.* (S.D.N.Y. 1976) 418 F.Supp. 620 [original analyses and conclusions in financial research reports prepared by a securities brokerage business were entitled to copyright protection] and *Merritt Forbes & Co. Inc.* v. *Newman Inv. Securities* (S.D.N.Y. 1985) 604 F.Supp. 943 [though standardized in form, bond underwriting documents containing financial data were entitled to copyright protection], with, *Financial Information, Inc.* v. *Moody's Investors Service, Inc.* (2d Cir. 1986) 808 F.2d 204 [copyright protection was not merited where a financial reporting service's reporting of municipal redemptions showed little independent original creation (researchers merely filled in five facts on a "card" report for each)].

copyrightable.  Our assumption is that the working papers and documents in question give expression to ideas and that these expressions are copyrighted.

Of course the protection afforded by a copyright is a limited one.  It protects against copying the work without the holder's permission but does not prevent anyone from using the ideas expressed in the work.  As applied to this opinion this means that while the copyright would prohibit anyone from copying the working papers and other documents (except for a fair use), it would not prevent anyone from using any method, system or idea revealed in those documents.  See *Baker* v. *Selden* (1879) 101 U.S. 99; *Muller* v. *Triborough Bridge Authority* (S.D. N.Y. 1942) 43 F.Supp. 298; *Aldrich* v. *Remington Rand* (N.D. Texas 1942) 52 F.Supp. 732; *Demetriades* v. *Kaufman* (S.D. N.Y. 1988) 680 F.Supp. 658.[6/]

Under the Copyright Act, copyright protection attaches automatically as soon as a work is "fixed" in any tangible medium and neither registration nor any type of designation or notice is necessary to trigger it.  (§§ 102, 405, 408; cf. H.Rept. at 52; S.Rept. at 51-52)  At that time, section 106 of the Act gives the copyright holder certain exclusive rights with respect to the work, among which are the right to authorize its reproduction, adaptation, publication, performance, and/or display.  (§ 106; cf., H.Rept. at 61; S.Rept. at 57.)  Thus:

"Subject to sections 107 through 118, the owner of copyright under this title has the exclusive right to do and to authorize any of the following:

"(1) to reproduce the copyright work in copies...;

"(2) to prepare derivative works based on the copyrighted work;

"(3) to distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

"(4) in the case of literary ... works, ... to perform the copyrighted work publicly; and

"(5) in the case of literary ... works, ... to display the copyrighted work publicly."

These rights operate independently of each other, and each may be owned and enforced separately. (Cf., §§ 201, subsec. (d)(2), 202; H.Rept. at 61, 123; S.Rept. at 57; 71 Ops.Cal.Atty.Gen. 16, 30 (1988).)  Assuming that the documents in question are copyrightable, i.e., that they are proper subjects for copyright protection, concern would be with possibly infringing the copyright holder's exclusive rights to authorize their reproduction, to authorize their distribution, and perhaps to authorize the preparation of derivative works from them.

---

6. In *Baker* v. *Selden, supra,* 101 U.S. 99, the high court held that although plaintiff could prevent the unauthorized reproduction of his copyrighted book describing a system of bookkeeping, he could not prevent others from using the system described and the forms exhibits in it.  The court said:

"The description of the art in a book, though entitled to the benefit of copyright, lays no foundation for an exclusive claim to the art itself.  The object of the one is explanation; the object of the other is use.  The former may be secured by copyright.  The latter can be secured, if it can be secured at all, by letters patent."

The first concern is obvious:  under clause (1) of section 106, the copyright holder has the exclusive right to authorize the making of copies of his or her work in whole or in part.  As the legislative history explains:

"Read together with the relevant definitions in section 101, [this right] means the right to produce a material object in which the work is duplicated ... in a fixed form from which it can be `perceived....' [A] copyrighted work would be infringed by reproducing it in whole or in any substantial part, and by duplicating it exactly or by imitation or simulation."  (H.Rept. at 61; S.Rept. at 58.)

It would seem obvious that copying the audit documents would come within the strict wording of this right.

The answer to whether the Department's activity would also be covered by the second exclusive right, that of preparing derivative works (§ 106(2)), is more elusive.  Section 101 defines a "derivative work" as one that is "based on one or more preexisting works, such as a translation, ... abridgment, condensation, or any other form in which a work may be recast....  A work consisting of ... annotations, elaborations, or other modifications, which, as a whole, represent an original work of authorship, is a `derivative work'."  (§ 101.)[7]  It may be that in the course of the performance of its statutory duties the Department will substantially use and recast particular documents, as opposed to copying them in toto.  Doing so may come within the rubric of the copyholder's right to control such adaptations.  On the other hand, the Department may merely have occasion to comment on particular documents which are presented to it, in which case that activity would not come within the right secured by clause (2).  The legislative history of the Copyright Act, which is instrumental in discerning its meaning (*Universal City Studios* v. *Sony Corp. of Amer.* (C.D.Cal. 1979) 480 F.Supp. 429, 443, aff'd. sub nom. *Sony Corp.* v. *Universal City Studios, Inc.* (1984) 464 U.S. 417), states that since "[t]o constitute a violation of section 106(2), the infringing work must incorporate a portion of the copyrighted work in some form ..., a detailed commentary on a work ... would not normally constitute infringement under this clause."  (H.Rept. at 62; S.Rept. at 58.)

The exclusive rights accorded by clauses (3), (4) and (5) of section 106, to authorize the distribution, performance, and display of copyrighted works all have one element in common: the activity involved must be "public."  (Cf., H.Rept. at 63; S.Rept. at 60.)  Concern would only arise with respect to clause (3), the right to control distribution, and perhaps clause (5), the right to control display of copyrighted works,[8] but in either case, we do not believe that the giving or showing them to other government agencies either constitutes distributing them to the public or displaying them publicly.

The definitional section of the Copyright Act, section 101, does not define the phrase "to the public" that is used in clause (3) of section 106, but it does define the term "publicly" in

_____

7.  Needless to say, for a derivative work to be protected, "the 'preexisting work' must come within the general subject matter of copyright set forth in section 102, regardless of whether it is or was ever copyrighted."  (H.Rept. at 57; S.Rept. at 55.)

8.  The definition of "display" given in section 101--i.e, "to show a copy of it" covers "any showing of a 'copy' of [a] work....  [It] would include the projection of an image on a screen or other surface by any method."  (H.Rept. at 64; S.Rept. at 60.)  It is conceivable that in the course the performance of its  statutory duties the Department might have to "display" a copyrighted work.  However, since "performing" a work means, inter alia, "to recite ... it" (§ 101) it is doubtful whether that right of the copyright holder would be involved.

connection with the rights given in clauses (4) and (5), to control the performance or display of a work. There it is said to mean--

> "... to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered." (§ 101, "public performance/display.")

The Congressional history of this definition indicates that it was deliberately adopted to overrule a line of cases which had held that performances in semi-public places (as for example, lodges, summer camps and private clubs) were not "public" for copyright purposes. (65 Ops.Cal.Atty.Gen. 106, 110 (1982) citing H.Rept. at 64; S.Rept. at 60-61.) But that same history clearly indicates that under the definition,

> "... routine meetings of businesses and governmental personnel would be excluded because they do not represent the gathering of a `substantial number of persons.'" (H.Rept., *supra*; S.Rept., *supra*; emphasis added.)

We can safely presume that the Congress had the same notion of "publicity" in mind when it used a variant of the term "publicly" to describe the right accorded in clause (3) of section 106 to control distribution of copies "to the public." (Cf., § 101.) Thus, either for the display of a work, or its distribution, such would have to take place, or be made to a place, that is open to the public or where a substantial number of persons are gathered. But as the above quoted fragment of the legislative history points out, such would not include "routine meetings of government officials." Subdivision (b) of section 8009 of the Savings Association Law strictly limits the disclosure of any information the Department receives in connection with its statutory duties, to certain governmental agencies-- (a) state and federal authorities that supervise financial institutions, (b) state, local and federal law enforcement agencies, and (c) state agencies engaged in the investigation of unsafe or unsound business practices. Under the above definition that would not amount to disclosure to the "public", and we therefore conclude that the distribution or display of any copyrightable documents to those governmental agencies does not come within a copyright holder's right to control distribution or display accorded by clauses (3) and (5) of section 106.

Still, we are left with the possibility raised in connection with the right to control reproduction, and possibly adaptation, secured by clauses (1) and (2). With respect to them, as we have mentioned, copying and/or adaptation would, other matters not considered, constitute an infringement of the copyright holder's rights. But other matters must be considered in copyright analysis, and one of them, the doctrine of "fair use" bears on the Department's use of the subject materials and would make the proposed use of the materials a noninfringement of the copyright.

2. Fair Use

As just seen, the Copyright Act of 1976 extends five fundamental rights to a holder of a copyright with respect to his or her work --the exclusive rights of controlling reproduction, adaptation, publication, performance, and display. These are said to "comprise the so-called `bundle of rights' that is a copyright." (H.Rept. at 61; S.Rept. at 57.) However, those rights are wholly statutory and so are strictly measured and defined by the parameters of the Copyright Act itself. (*Sony Corp.* v. *Universal City Studios, Inc.*, *supra*, 464 U.S. at 429, 431, 447; *Universal City Studios* v. *Sony Corp. of Amer.*, *supra*, 480 F.Supp. at 443; 71 Ops.Cal.Atty.Gen. 16, 19, *supra*; 65 Ops.Cal.Atty.Gen. 106, 108, *supra*.) As given in the Act, the rights accorded by section 106 are "qualified" since the preamble to that section specifically makes them subject to the provisions of other sections of the Act. Most significant for purposes of this opinion is section 107 in which Congress has codified the doctrine of "fair use." (65 Ops.Cal.Atty.Gen. 106, 111, *supra*.)

The doctrine of "fair use" was developed by courts in cases arising under the 1909 Copyright Law as an "equitable rule of reason" to balance the competing interests of the copyright owner and the public generally. (*Ibid.* citing H.Rept. at 65-66 and S.Rept. at 62.) Basically it was used "to create a privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without [the owner's] consent...." (*Rosemont Enterprises* v. *Random House* (2d Cir. 1966) 366 F.2d 303, 306, cert. den. (1967) 385 U.S. 1009; accord, *Supermarket of Homes* v. *San Fernando Valley Bd.* (9th Cir. 1986) 786 F.2d 1400, 1408.) As the high court has said, "Any individual may reproduce a copyrighted work for a `fair use'; the copyright owner does not possess the exclusive right to such a use." (*Sony Corp.* v. *Universal City Studios, Inc.*, supra, 464 U.S. at 433.)

Section 107 does not strictly define what a "fair use" is, but sets forth instead four factors which should be considered by way of general guidance to determine whether a particular use is a "fair" one. (H.Rept. at 65, 66, 74; S.Rept. at 62.) The section provides as follows:

"Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction and copies ... for purposes such as criticism, comment, news reporting, [etc.], is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include --

"(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

"(2) the nature of the copyrighted work;

"(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

"(4) the effect of the use upon the potential market for or value of the copyrighted work."

(§ 107, codified almost verbatim from *Williams & Wilkins Company* v. *United States* (Ct. Cl. 1973) 487 F.2d 1345, 1352, aff'd. per curiam (1975) 420 U.S. 376; emphasis added.)

Not only has Congress thus codified the doctrine of "fair use" in section 107, but it has specifically declared that the "fair use of a copyrighted work" "is not an infringement of copyright." (§ 107; cf., H.Rept. at 66; S.Rept. at 62.) The section therefore compels a finding of noninfringement of copyright if the use made of a work is a "fair use" under the particular circumstances. (71 Ops.Cal.Atty.Gen. 16, 19, *supra*; 65 Ops.Cal.Atty.Gen. 106, 111, *supra*.) Since "the line which [is to] be drawn between fair use and copyright infringement depends on an examination of the facts in each case" (*Meeropol* v. *Nizer* (2d Cir. 1977) 560 F.2d 1061, 1068, cert. den. (1978) 434 U.S. 1013), we proceed to examine the facts presented here. Doing so we will conclude that they compel a finding of fair use and consequently that no infringement of copyright takes place.

A. Factor one has us examine the nature and character of the use, including whether it is for commercial purposes. Here it is plain that the contemplated use is non-commercial and that it is for a very important governmental purpose from which the public benefits, i.e., the oversight of the savings and loan industry. As we have seen at the very outset of this Opinion, under the Savings Association Law, the Savings and Loan Commissioner supervises all associations in this state. (§ 8050.) Needless to say, a vital part of that supervision involves knowing the true financial condition of those associations. (See e.g., The Wall Street Journal, vol. CXX, No. 19 (Jan. 27, 1989)

at pp. A1, A2, A8; <u>The San Diego Union</u> (Jan. 27, 1989) at p. A-1.) Toward that end, the Law requires each association to annually audit its books and accounts, and to make and file a verified annual audit report therefrom. (§§ 8156, 8157.) The Commissioner prescribes the scope of that audit (§ 8157) and approves the certified public accountant who conducts it (§ 8156). But the final audit report itself may not necessarily provide a true picture of an association's finances because it is summary in nature and is only prepared after discussions are held between the auditor and the management of the association being audited, in which "problems" encountered in the audit are resolved. (Cf., fn. 2, *ante*.) Those problem areas, which must be known in order for the Department to fully understand an association's financial status, may never surface in the final audit report. Thus, it is often necessary for documents in addition to the final audit report (and accompanying financial statements) to be examined for that understanding to be had. The audit plan of the audit company and the working papers of those who actually do the audit provide useful information toward that end. They also disclose the depth and detail of the audit that was made.

The Savings Association Law recognizes the need for the Department to obtain such documents. Section 8157, for example, provides that the Commissioner can require an auditor to furnish information in addition to that contained in the audit report (§ 8157; cf., § 8151 [associations must make and file such other reports as the Commissioner may from time to time require]; §§ 8151, 8152 [Commissioner on his own may examine the financial condition of any association and appoint a CPA to do so].) To further secure complete and accurate information about associations doing business in this state, section 8158 provides that

"... the commissioner, or any department employee authorized by [him/her], shall have free access to all books and records of an association ... that relate to the business of the association...." (*Id.*, subd. (a).)

The finding of irregularities with an association can result in action taken either by the Department or by other agencies. Regarding the former, if the Commissioner as a result of any examination or from any report finds that any association or its subsidiaries is violating the provisions of the Savings Association Law or is engaging in an unsafe or unsound business practice, he or she must order the association to discontinue the violation or practice. (§ 8200.) He or she may also require that any director, officer or employee who participated in a violation or an unsafe or unsound practice, or who has breached his or her fiduciary duty, be removed, after hearing on the matter, from the association. (§ 8201.) And, if as a result of any examination or from any report the Commissioner believes that any association (1) is in an impaired condition, (2) is engaging in practices that threaten to result in an impaired condition, or (3) is in violation of an order or injunction, he or she may appoint a receiver for the association. (§ 8250.) When, in the same circumstances the Commissioner believes that the public interest may be served by the appointment of a conservator, he or she may appoint one for the association. (§ 8225.)

But the Savings Association Law also contemplates that certain state, local, and federal agencies may be involved in taking action with respect to errant associations. As we have seen, while section 8009 provides that any information received by the Department in the discharge of its statutory duties is confidential (*id.*, subd. (a)), it also provides that

"... the commissioner may furnish information relating to the condition or operation of any association ... to state and federal authorities that supervise financial institutions, to state, local and federal law enforcement agencies, and to state agencies engaged in the investigation of unsafe or unsound business practice." (*Id.*, subd. (b).)

It appears that in the course of its oversight of one of the state's associations, it was determined that the final annual audit report that was made and filed did not provide sufficient information regarding the association's finances for the Department to adequately assess them. The audit plan, working papers, and other documents relating to the audit were needed if that assessment was to be made. Apparently they were provided, at least in part, but with a proviso that since they are copyrightable materials, the Department could not copy them or give them to other government agencies under section 8009, subdivision (b).

From the foregoing description of the workings of the Savings Association Law, it is clear that such use of the documents (a) is limited in scope, (b) is strictly non-commercial, and (c) is for a governmental purpose which, as we have said, is of considerable importance to the public today--scrutinizing and maintaining the financial integrity of the savings and loan industry. (See e.g., The Wall Street Journal, supra, at pp. A1, A2, A8; The San Diego Union, supra, at p. A-1.) This characterization of the use would point to it being a "fair one" under factor one of fair use analysis: First, the use is non-commercial, and while that is not necessarily conclusive on the overall issue, it does raise a presumption that a use will be found a fair one. (*Sony Corp.* v. *Universal City Studios, Inc.*, *supra*, 464 U.S. at 449.) But then the use advances important public interests, to which a copyright holder's rights have been said to yield, for "copyright is `[n]ot primarily for the benefit of the author, but primarily for the benefit of the public'" (*Universal City Studios* v. *Sony Corp. of Amer.*, *supra*, and "the copyright law ... makes reward to the owner a secondary consideration." (*United States* v. *Paramount Pictures, Inc.* (1948) 334 U.S. 131, 158; cf., *Sony Corp.* v. *Universal City Studios, Inc.*, *supra*, 464 U.S. at 429.) Thus it has been said that,

> "[An] author [should expect] that the copyright scheme itself will sometimes require use of his work necessary in the public interest for which he will not be paid, and society expects that the copyright scheme will either allow such use without reducing the author's incentive or impose no excessive burdens on the public when use is controlled.... [Citation]." (*Universal City Studios* v. *Sony Corp. of Amer.*, *supra*, 480 F.Supp. 429, 448.)

Where the use of a copyrighted work advances public interests, it is likely that fair use will be found, especially when the copyright holder suffers no economic harm therefrom. (*Sony Corp.* v. *Universal City Studios*, *supra*, at 454; *Williams & Wilkins Company* v. *United States*, *supra*, 487 F.2d 1345, 1352, 1354, 1356-1359, 1362; 71 Ops.Cal.Atty.Gen. 16, 24-25, 26-27, *supra*.) For example, in *Williams & Wilkins Company* the court found that the copying of articles from medical journals was a fair use under the circumstances because (a) the copying was limited, (b) it served an important public purpose of advancing medical knowledge, and (c) there was no detriment to the copyright holder from the activity. (*Id.* at 1354, 1362.) The Department's activity here would similarly be limited and advance an important public interest, and, as we shall come to see, there would be no countervailing harm to the copyright holder because of it.

The legislative history of the Copyright Act gives some examples of what Congress thought would constitute a fair use of copyrightable materials. As observed before, such statements provide an indication of the reach of copyright protection and is instrumental in discerning its scope under the Copyright Act. (*Universal City Studios* v. *Sony Corp. of Amer.*, supra, 480 F.Supp. 429, 443.) Among the uses Congress thought would be a fair use is the

> "... reproduction of a work in legislative or judicial proceedings or reports." (H.Rept. at 65; S.Rept. at 61-61, approving examples given in a 1961 Report by the Register of Copyrights on the "General Revision of the U.S. Copyright Law.")

Elsewhere in the legislative history, the following commentary appears:

"The Committee [the House Committee on the Judiciary] has considered the question of publication, in Congressional hearings and documents, of copyrighted material. Where the length of the work or excerpt published and the number of copies authorized are reasonable under the circumstances, and the work itself is directly relevant to a matter of legitimate legislative concern, the Committee believes that the publication would constitute fair use." (H.Rept. at 73; emphasis added.)

In *Williams & Wilkins Company* v. *United States*, *supra*, 487 F.2d 1345, the court spoke of fair use in judicial proceedings:

"We can not believe ... that a judge who makes and gives to a colleague a photocopy of a law review article, in one of the smaller or less available journals, which bears directly on a problem both judges are considering in a case before them is infringing the copyright rather than making `fair use' of his issue of that journal." (*Id.* at 1353.)

More recently in *Jartech, Inc.* v. *Clancy* (9th Cir. 1982) 666 F.2d 403, the Ninth Circuit held that the making of abbreviated copies of films for evidence to be used in a judicial [nuisance abatement] proceeding was a fair use of the material. (*Id.* at 407.) Indeed, a leading commentator on copyright law has found it "inconceivable that any court would hold [the reproduction of copyrighted materials for judicial proceedings] to constitute infringement." (3 Nimmer On Copyright, § 13.05[D][2] (1983 ed.).)

We see no difference between the use of copyrighted material in judicial or legislative proceedings and their use administratively in a matter of legitimate administrative concern. Given the importance to the public in the Department's copying and furnishing the audit documents to appropriate government agencies, we find that factor one favors a finding that that would be a fair use of them.

B. Factor two has us examine the nature of the copyrighted work. Doing so we see that the documents involved are "created" for the most part to serve one specific purpose -- making an audit required by law to test the financial integrity of a savings association. And when such documents are generated, that is done with an expectation that they might be "used" under the Savings Association Law by the Department and other governmental agencies. As we proceed to explain, the nature of the audit materials does not fit well in the traditional copyright scheme, but to the extent that it is tested in fair use analysis, it favors a finding of fair use.

As stated in the Constitution, the purpose for copyright protection is "[t]o promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings...." (U.S. Const., art. I, § 8, cl. 8; 65 Ops.Cal.Atty.Gen. 106, 108, *supra*.) The Copyright Act seeks to encourage such creative work by rewarding it through the grant of a limited monopoly over a work's exploitation. (Cf., *Sony Corp.* v. *Universal City Studios, Inc.*, *supra*, 464 U.S. 417, 429, 450; *Twentieth Century Music Corp.* v. *Aiken* (1975) 422 U.S. 151, 156; *United States* v. *Paramount Pictures*, *supra*, 334 U.S. 131, 158; *Williams & Wilkins* v. *United States*, *supra*, 487 F.2d 1345, 1352; *Universal City Studios* v. *Sony Corp. of Amer.*, *supra*, 480 F.Supp. 429, 447.) Thus, the aim of copyright protection "is, by [this] incentive, to stimulate artistic creativity for the general public good." (*Twentieth Century Music Corp.* v. *Aiken*, *supra*; see also *Universal City Studios* v. *Sony Corp. of Amer.*, *supra*.)

In the situation presented, however, "incentive" to create stems from the requirements of the Savings Association Law and is not an independent assertion of artistic creativity. Documents are prepared for a specific audit of a particular association as required by that Law. (§§ 8156, 8157.)

Since the requirements of the Law are present in any case, any "incentive" to create them would neither be fostered or encouraged by a copyright monopoly, nor impaired if one is not given. Furthermore, the audit documents are of such a nature that they are created with a full understanding of the workings of the Savings Association Law. That includes an appreciation of the possibility that the Department may subsequently "use" them under the very Law that compelled their creation.

The only concern we see that an auditor might have in preventing the replication of his audit documents, in addition to protecting the confidentiality of his client's affairs, is that of not revealing his methods of operation. Those methods, which can be gleaned from the working papers, and certainly from the audit plan, may have further financial value to a firm conducting an audit. But, as we have pointed out, the copyright simply affords protection against reproduction of the work and does not prevent others from using the methods of operation revealed by the audit plan and working papers. (See fn. 6, *supra*.)

Returning to the claim of copyright, we find that the nature of the documents favors a finding of fair use, which determination is strengthened when one considers that factor in conjunction with factors one and four of fair use analysis ——i.e., that the documents are used for an important, non-commercial governmental purpose and, as we shall see, that the use does not supplant a potential market for the copyright holder. (Cf., *Sony Corp.* v. *Universal City Studios, Inc.*, *supra*, 464 U.S. at 449-450; *Williams & Wilkins Company* v. *United States*, *supra*, 487 F.2d 1345, 1353; *Universal City Studios* v. *Sony Corp. of Amer.*, *supra*, 480 F.Supp. at 453); 71 Ops.Cal.Atty.Gen. 16, 25, *supra*.)

C. Factor three of fair use analysis has us look to the substantiality of the taking in the use of copyrightable works. Here, it is entirely possible that an entire "work" will be taken. While that fact can militate against a fair use being found, it does not necessarily defeat such a finding. As we noted in a recent Opinion, the factor is but one to be considered along with the others set forth in section 107 in balancing the equities in a copyright case, and the taking or use of a whole work can still constitute a "fair use" where there is no accompanying reduction in the market for the original work. (See 71 Ops.Cal.Atty.Gen. 16, 26, *supra*, citing inter alia, *Universal City Studios* v. *Sony Corp. of Amer.*, *supra*, 480 F.Supp. 429, 454; see also *Sony Corp.* v. *Universal City Studios, Inc.*, *supra*, 464 U.S. at 449-450; *Williams & Wilkins Company* v. *United States*, *supra*, 487 F.2d at 1353.) As we now proceed to show, we find no such reduction in a potential market for the original work in this case.

D. Factor four of the fair use analysis has us look to the effect of a use on the potential market for, or value of, the copyrighted work. This is known as the "issue of harm" which has been described as "undoubtedly the single most important element of fair use." (*Harper & Row* v. *Nation Enterprises* (1985) 471 U.S. 539, 566.) In analyzing this factor, "courts have focused on considerations such as whether the ... use `tends to diminish or prejudice the potential sale of [the] work' [citations], whether the use `has tended to interfere with the marketability of the ... work' [citation], or whether the use has the intent or effect of `fulfilling the demand for the ... work' [citations]. And recently we learn [from the high court in *Sony*] that where a noncommercial use is involved as it is here, there must be a showing that some meaningful likelihood of future harm exists...." (71 Ops.Cal.Atty.Gen. 16, 26, *supra*.)

An examination of these subfactors convinces us that the very limited copying and distribution of the audit documents would not affect their potential market or value. As we have seen in connection with our discussion of their nature, when audit documents are prepared, that is done for the very specific purpose of making an audit of an association so it can comply with the annual audit requirement of the Savings Association Law. (§§ 8156, 8157.) There, at least the

11.                                                                                            88-1241

preparation of the working papers comes about only in connection with that "one-shot" endeavor, and because of their inherent specificity, they would have no further function or use in any other market to be exploited by the copyright holder. In other words, since the sole "market" for the working papers is the very narrow one directed to the specific audit of the particular association, any copying and distribution by the Department could not supplant or prejudice another potential market for them or otherwise interfere with their marketability. A different situation exists with respect to the audit plan. There what is developed may contain methods of operation and systems that could be applied elsewhere. And so it is possible that other markets would stand to be harmed if an auditing firm's unique processes and procedures were used by others. But again, protection against the use of ideas, methods, and systems, is not the function of copyright. (*Baker* v. *Selden*, *supra*, fn. 6.)

Moreover, even if the just-mentioned potential market for the auditor were appropriate for copyright protection, the Department's limited copying and distribution of the audit documents pursuant to subdivision (b) of section 8009 of the Savings Association Law would not take place in it. That activity therefore would not impinge upon the market or diminish its worth. (Compare, 71 Ops.Cal.Atty.Gen. 16, 31-33, *supra* and 65 Ops.Cal.Atty.Gen. 106, 116-117, *supra*, where a non-commercial governmental use was directed to and did supplant a potential market for the copyright holder.) With this absence of harm, factor four favors a finding of fair use.

In *Sony Corp.* v. *Universal City Studios, Inc.*, *supra*, 464 U.S. 417, our high court observed:

> "The purpose of copyright is to create incentives for creative effort. Even copying for noncommercial purposes may impair the copyright holder's ability to obtain the rewards that Congress intended him to have. But a use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create." (464 U.S. at 450.)

A finding of fair use in the situation presented is even more compelling for the author's incentive to create is not independently wrought and there is no potential market for his work that is suitable for copyright protection which stands to be harmed by the limited use under the Savings Association Law. Weighed in the four-factored calculus of section 107 we find that the purpose and character of the use, the nature of the copyrighted work, and the lack of harm to such a market, make the Department's copying and distribution of audit documents under section 8009, subdivision (b) a fair use of those materials. Accordingly we conclude that the Department, through its Commissioner, may copy and furnish such documents to other governmental agencies under the subdivision without infringing any copyright in them that may exist.[9]

* * * * *

---

9. In view of our conclusion that no infringement would occur by reason of the fair use doctrine we do not reach the question whether the Eleventh Amendment to the United States Constitution would bar suit against the Department or its officers for copyright infringement. For a recent case on that question see *BV Engineering* v. *Univ. of Cal., Los Angeles* (9th Cir. 1988) 858 F.2d 1394, cert. den. (March 20, 1989) ___ U.S. ___ [57 U.S. Law Week 3621].)